**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Brett C. KIMBERLIN,**
**Defendant-Appellant.**

Nos. 82–1025, 83–2190, 83–2191 and 83–2341.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1984.

Decided Oct. 22, 1986.

As Amended Nov. 4, 1986.

Rehearing and Rehearing En Banc Denied Jan. 9, 1987.

See also, D.C., 483 F.Supp. 350.

Donald Morano, Chicago, Ill., for defendant-appellant.

John J. Thar, Robert C. Perry, Asst. U.S. Attys., Indianapolis, Ind., for plaintiff-appellee.

Before CUMMINGS and CUDAHY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

In Appeal No. 82–1025 defendant Brett Kimberlin appeals from conviction and sentence on Counts 1 through 22 of an indictment containing 34 counts. The first 22 counts arose out of eight explosions in Speedway, Indiana from September 1, 1978 through September 6, 1978.

In Counts 1 through 8, each corresponding to one of the explosions, defendant was charged with possession of a firearm (destructive device) not registered to him, in violation of 26 U.S.C. § 5861(d). In Counts 9 through 16, he was charged with manufacture of a firearm in violation of Chapter 53 and § 5861(f) of 26 U.S.C. In three counts (17, 18, and 22), he was charged with maliciously damaging by explosive the property of an entity receiving federal financial assistance, in violation of 18 U.S.C. § 844(f), and in three counts (19, 20, and 21) with so damaging property at a business used in and affecting interstate commerce, in violation of 18 U.S.C. § 844(i). In Count 22, it was also charged that personal

injury resulted, augmenting the maximum penalty prescribed by § 844(f).[1]

The first 22 counts were originally tried in September, 1980, with all other counts. At that first trial, the jury acquitted on Count 25, convicted on Counts 26 through 34, but could not agree on a verdict on Counts 1 through 24. The second trial (in May, 1981) was confined to Counts 23 and 24, and resulted in conviction. The convictions and sentences at these trials were, for the most part, affirmed on appeal. *See United States v. Kimberlin,* 781 F.2d 1247, 1249 (7th Cir.1985).[2] The third trial, August 17 to October 15, 1981, was a retrial of the first 22 counts. This trial is the subject of Appeal No. 82–1025.

In 1983 motions for new trials as to each group of counts, claimed to be based on newly discovered evidence, were denied. Appeals were taken and consolidated in this court with No. 82–1025. No. 83–2190 relates to Counts 1 through 22, the third trial; No. 83–2191 to Counts 23 and 24, the second trial; and No. 83–2341 to Counts 26 through 34, the first trial.

## I. APPEAL NO. 82–1025

### A. Testimony Of Witnesses Interviewed Under Hypnosis

A principal issue arises from the fact that six witnesses had been hypnotized during the investigation of the bombings in the fall of 1978.

A motion to suppress the testimony of these witnesses was heard and denied before trial. There was testimony by the two hypnotists involved, by knowledgeable experts concerning the dangers of hypnosis, and by special agents of the Bureau of Alcohol, Tobacco and Firearms (ATF) who had been involved in the process. Tape recordings of the hypnotic sessions were placed in evidence, along with transcripts thereof and statements of the witnesses, taken in two instances before the hypnotic session.

Judge Steckler decided to permit the jury to hear the testimony of the hypnotized witnesses, with cautionary instructions. The form of the instruction given each time a hypnotized witness testified, was agreed upon by counsel. It told the jury not to attach greater weight or significance to testimony of witnesses who have undergone hypnosis than that given to the testimony of other witnesses, and that the jury may judge what effect, if any, the process of hypnosis had upon the witness' memory and ability to recall.

Defense counsel had stated: "[W]e have selected two tapes that we would like for the Court to hear and one is a hypnotic session with Mr. Carr and the other is hypnotic session with Mr. Rogers and we would request these be heard as merely illustrative of what the hypnotic sessions were like." The judge listened to these two tapes.

In colloquy just before argument, Judge Steckler indicated what he described as his "leaning":

> [W]hile those guidelines [previously referred to as recommended by the Tenth Circuit] did not obtain in the case here at bar I feel there was not such an abuse by suggestive questions in the interrogation of the subjects under hypnosis that their recall would be so contaminated that a jury should be precluded from hearing their post hypnotic trance recall or testimony.

> Now, a jury has a right to hear it but they must be cautioned. They certainly have a right to weigh it but with very carefully drawn cautionary instructions.

Later, during argument of counsel, he said:

---

1. Defendant was sentenced to concurrent five year terms on the first 16 counts, consecutive five year terms on Counts 17 through 21, and a consecutive 20 year term on Count 22, aggregating 50 years.

2. Kimberlin decisions not mentioned in 781 F.2d at 1249 are: *Kimberlin v. Department of Treasury,* 774 F.2d 204 (7th Cir.1985), and *Kimberlin v. United States Department of Justice,* 788 F.2d 434 (7th Cir.1986).

Now, what I have heard leads me to conclude that there was no abusive suggested interrogation.

There were one or two very minor places and I say very minor where one might claim that the question was suggestive to elicit a particular answer but I analyzed that testimony very carefully and I just cannot bring myself around to believe that the interrogators had a wrongful motive, had a pro-prosecution motive in the manner in which they conducted the interrogation.

At trial, the jury heard testimony similar to that in the pretrial hearing, and the court gave the agreed cautionary instruction at the time of the testimony and repeated it in the instructions at the close of trial.

In 1978, when the investigation took place, and in 1981 when the pre-trial hearing and trial occurred, there was ample precedent for Judge Steckler's view that the jury should hear the testimony and decide questions of weight and credibility in the light of evidence offered as to the dangers inherent in hypnotism and the circumstances of the hypnotic sessions involved.

A leading case was *Harding v. State*, 5 Md.App. 230, 246 A.2d 302, 306 (1968), *cert. denied*, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969).[3] The weight of the evidence was a question for the trier of fact. This view retained vitality after 1981. *See, e.g., Pearson v. State*, 441 N.E.2d 468, 473 (Ind.1982); *Chapman v. State*, 638 P.2d 1280, 1285 (Wyo.1982); *State v. Armstrong*, 110 Wis.2d 555, 575, 329 N.W.2d 386, *cert. denied*, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983); *State v. Wren*, 425 So.2d 756, 759 (La.1983).

Attention had, however, been directed in academic writings to real dangers that the process of hypnosis may cause a witness to give testimony he believes to represent his true recollection, but in fact does not. In 1968 in response to the *Harding* decision, the United States Department of Justice instructed United States Attorneys "that before using hypnosis on any witness, the United States Attorney must obtain the written authorization of the Assistant Attorney General of the Criminal Division." FBI employees were instructed to take no part in such interrogation without a specific grant of authority. By 1979, the FBI issued a memorandum not only requiring advance authorization, but stating "[y]ou should consider utilizing only a psychiatrist, psychologist, physician, or dentist who is qualified as a hypnotist.... It is important that you either audio or video tape the entire session.... Video tape, however, is the preferred method of recording these sessions." On December 14, 1979, ATF, after internal discussions over several years, adopted procedural guidelines. The requirements include: a licensed mental health professional as hypnotist, advance headquarters approval, tape or video recording, questions that are not leading, and precaution to avoid suggestive comments.

Hypnosis is defined as "the act of inducing artificially a state of sleep or trance in a subject by means of verbal suggestion by the hypnotist or by the subject's concentration upon some object. It is generally characterized by extreme responsiveness to suggestions from the hypnotist." *Black's Law Dictionary* 668 (5th ed. 1979).

Several dangers are associated with hypnosis. One is hyper-suggestiveness. It makes hypnosis subjects susceptible to

**3.** In *State v. Collins*, 296 Md. 670, 687 and n. 1, 464 A.2d 1028, 1034 n. 1 (1983), the Supreme Court of Maryland repudiated *Harding* and adopted a *per se* rule of inadmissibility based on *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *Frye* governs the admissibility of evidence that is the product of new scientific methods. It requires that the scientific method be generally accepted as reliable in the scientific community. We think the more logical approach to the question is to determine whether the experience of hypnosis has rendered a witness incompetent to testify. In any event we have indicated elsewhere in the opinion that none of witness Carr's testimony appears to be the product of hypnosis, that it is doubtful whether the recall of any of the four Graham employees was significantly enhanced by hypnosis, and that much of Jones' testimony is consistent with his pre-hypnosis statements.

suggestion. Diamond, *Inherent Problems in the Use of Pretrial Hypnosis as a Prospective Witness*, 68 Cal.L.R. 313, 314, 316, 333 (1980) (hereinafter cited as Diamond). Suggestions may deliberately or unwittingly come from the hypnotist or his attitude, demeanor, expectations, tone of voice and body language as well as the context and purpose of the hypnotic sessions. *Id.* at 333. The hypnotist cannot avoid implanting suggestions.

Another inherent danger is hyper-compliance. It creates two goals for hypnosis subjects, the desire to succeed in being hypnotized and to please the hypnotist. *See e.g., Brown v. State*, 426 So.2d 76, 83 (Fla.App.1983); *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 271, 723 P.2d 1354, 1382, *cert. denied*, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982).

Confabulation is also a problem associated with hypnosis. Confabulation has been defined as "fill[ing] in those aspects which the individual cannot remember in an effort to comply with the suggestions of the hypnotist." Orne, *The Use and Misuse of Hypnosis in Court*, 27 International Journal of Clinical and Experimental Hypnosis 311, 319 (1979) (hereinafter cited as Orne). Confabulation causes occasional memory distortion, sheer fantasy and willful lies or a mixture of fact and fantasy. Orne at 317–19.

Two more problems arise after the hypnosis session and stem directly from the use of hypnotically enhanced testimony in court. Studies show that jurors tend to perceive hypnosis as an infallible method of discovering the truth, when it is not. Dilloff, *The Admissibility of Hypnotically Influenced Testimony*, 4 Ohio N.U.L.Rev. 1, 4–5 (1977); Note, *The Admissibility of Testimony Influenced by Hypnosis*, 67 Va. L.R. 1203, 1208–09, 1222 (1977).

Hypnosis also causes a syndrome called "post hypnotic source amnesia." This syndrome

> occurs when something learned under hypnosis is carried into the wakened state but the fact that the memory or thought was learned under hypnosis is forgotten.... A subject who has lost the memory of the source of his learned information will assume that the memory is spontaneous to his own experience. Such a belief can be unshakeable, last a lifetime, and be immune to all cross-examination. It is especially prone to "freeze" if it is compatible with the subject's prior prejudices, beliefs, or desires.

Diamond, *supra*, at 336 (footnotes and citations omitted); *accord*, Orne, *supra*, at 320, 332.

Judicial responses to the dangers inherent in the use of hypnotism have fallen generally into several categories.

a. In 1982 the Supreme Court of California held "the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." *People v. Shirley*, 31 Cal.3d at 66–67, 181 Cal.Rptr. at 273, 723 P.2d at 1384.

b. Some courts permit testimony only about what the witness remembered prior to hypnosis. *Contreras v. State*, 718 P.2d 129 (Alaska 1986); *Rock v. State*, 288 Ark. 566, 708 S.W.2d 78 (1986).

c. In 1981 the Supreme Court of New Jersey held "that testimony enhanced through hypnosis is admissible in a criminal trial if the trial court finds that the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory." *State v. Hurd*, 86 N.J. 525, 432 A.2d 86, 95 (1981). The court, however, adopted six threshold requirements before introduction of hypnotically refreshed testimony. These requirements are, briefly:

(1) A psychiatrist or psychologist experienced in the use of hypnosis must conduct the session.

(2) The professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense.

(3) Any information given to the hypnotist by law enforcement personnel or

the defense prior to the hypnotic session must be recorded, either in writing or another suitable form.

(4) Before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them.

(5) All contacts between the hypnotist and the subject must be recorded. Videotape is encouraged, but not mandatory.

(6) Only the hypnotist and the subject should be present during any phase of the hypnotic session.

d. Courts in a fourth group decline a *per se* rule of inadmissibility and mandatory standards for the hypnotic sessions, but, after scrutiny of the circumstances, make a judgment concerning the reliability and impact of the testimony in question. *E.g., Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112 (8th Cir. 1985), *cert. denied*, — U.S. —, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986); *Armstrong, supra; United States v. Valdez*, 722 F.2d 1196 (5th Cir.1984). In *Valdez*, the Fifth Circuit applied, at least in part, the test of Rule 403, FED.R.EVID., whether probative value of evidence is substantially outweighed by the danger of unfair prejudice, and the test of Rule 103(a), whether the admission of challenged evidence has affected a substantial right of the party. 722 F.2d at 1203, 1204.

In a factually dissimilar case, this court recently declined to adopt a *per se* rule of exclusion or to pronounce general standards governing admissibility. *United States v. Keplinger*, 776 F.2d 678 (7th Cir. 1985).

We remain unpersuaded that a sweeping rule of inadmissibility is appropriate.

With respect to the mandatory requirement of *Hurd* or similar procedures, it should be noted, in the case before us, (1) that the hypnotic sessions were recorded on tape, and (2) that although the hypnotists were local and state police officers, they were independent of the federal agency investigating the case. With these two qualifications, relating to the second and

fifth *Hurd* standards, the hypnotic sessions in this case did not comply with *Hurd.*

We recognize that adherence to such standards would be prophylactic against the dangers of the use of hypnosis, and would aid courts in making determinations concerning the reliability of the testimony of persons who had been under hypnosis. Investigating agencies may be well advised to follow them. We decline, however, to adopt them in this decision as standards which must universally be met before a witness who has been hypnotized can be accepted as competent.

We do not underestimate the danger that persons who have been under hypnosis may be led to testify beyond their genuine memory, yet in the belief that they actually observed what they describe. At least careful scrutiny is required.

We are particularly unprepared to adopt the sweeping and mandatory rules in a case such as this where rules had not been developed at the time of this investigation (and indeed *Hurd* preceded the trial by only five weeks) and where there is so little probability that any testimony resulting from suggestion or confabulation in the course of hypnosis affected the outcome. Whatever rules may evolve in this circuit on this subject, we shall be guided by examining the circumstances of this case for any likelihood that the effect, if any, of hypnosis on the evidence was unfair to defendant Kimberlin.

In making this analysis, we first examine the evidence excluding the testimony of the six hypnotized witnesses.

There were eight explosions: Nos. 1, 2 and 3 occurred September 1, 1978 at 9:49 PM, 10:05 PM, and 10:35 PM; No. 4 took place at 1:50 AM, September 2. Thus four occurred during the night of September 1–2. Number 5 occurred at 12:15 AM, September 3; No. 6 at 9:50 PM, September 3; No. 7 at 9:45 PM, September 5; and No. 8 at 8:15 PM, September 6.

Examination of the explosion sites revealed components of the explosive devices. DuPont Tovex 200 high explosive was iden-

tified at the sites of Nos. 1, 2, 4, 6, 7 and 8. At No. 3 there was identified a high explosive of the water gel type which could be Tovex. Leg wires from DuPont electrical blasting caps were found at Nos. 1, 3, 4, 5, 6, 7 and 8.

Defendant had been engaged in construction on his land in rural Jackson County, Indiana, and engaged an architect for that work. Certain blasting was decided upon. On May 14, 1975, defendant was present when the architect purchased 86 sticks of Tovex 200 and 50 blasting caps with leg wires. Between 13 and 22 sticks of Tovex were used on defendant's project. Confer, one of defendant's business associates, testified that in July, August, or September, 1975 defendant asked him to help unload a truck. In the process defendant warned Confer about two cardboard boxes of explosives in the trunk. He said these were some the architect had purchased for him and that the caps were in the cab. There was testimony by persons who worked on defendant's land that they observed no use of explosives on the property after the initial blasting.

There was testimony that monomethylamine nitrate (MMAN) is found in DuPont Tovex and Tovan, and those are the only products containing it. Traces of MMAN were found in swabbings taken from defendant's Mercedes automobile in December, 1978 and from a blue over white Chevrolet Impala searched September 21 and used by defendant from about September 13 to 20. Although it is possible for MMAN to exist in natural materials, there was expert testimony that its concentration would be too low for detection.

Patricia Strait is the sister of Sandra Barton, defendant's friend and one of his alibi witnesses. She lives a short distance from Austin, Texas. On March 10, 1979, Patricia was working in her yard and pulled out from under a tree three DuPont blasting caps and 14 sticks of Tovex 200. There was evidence that defendant had been in the general vicinity during the period from September to December, 1978. Although there had been an attempt to oblit-erate the date shift code on that Tovex, ATF analysts testified that it was the same as that on the Tovex purchased May 14, 1975.

Examination of the explosion sites also revealed a Mark Time timer at Nos. 6 and 8, and timer parts consistent with 60 minute Mark Time or Micronta timers at Nos. 1, 2, 3, 4, 5 and 7. The Mark Time and Micronta are made by the same company and apparently differ only in name. Graham Electronics, a distributor of Mark Time timers, had three stores in Marion County where Speedway (as well as Indianapolis) is located. Records showed sales of 16 timers from May 3, 1978 through September 9, 1978. They showed a sale of six on August 23, which a customer had ordered August 21; three on September 2, and five on September 5.

Four Mark Time timers, altered so as to start an electric device rather than turn one off, were found in the trunk of the Impala on September 21, 1978, and two timers were found by Patricia Strait in her yard March 10, 1979.

Lead shot was found at site Nos. 5, 6 and 7. Two 25–pound bags of lead shot and three boxes of .445 caliber lead balls were found in the Impala September 21.

Batteries were found, as follows: A "battery" at No. 1; "Ray–O–Vac battery" No. 3; "Sportsman battery" No. 4; "battery" No. 5; "Ray–O–Vac 6 volt battery" No. 6; "Ray–O–Vac battery" No. 7; "Ray–O–Vac Sportsman battery" No. 8. A 6–volt Mallory battery was found in the trunk of the Impala September 21.

Lynn Coleman identified defendant as the man he saw get out of a Mercedes and place a paper sack in a trash can at the site of explosion No. 1. He said this occurred after 9:00 PM, September 1, 1978. Coleman later heard an explosion. Coleman had not contacted government agents concerning this observation until February, 1981, more than two years after the event, and four months after the first trial. He said he had parked in front of a store; a Mercedes pulled by on his left; went up a few car lengths; made a U turn; passed

him in the opposite direction; and stopped about 100 feet back of Coleman. Through his rear view mirror he saw the man he identified as defendant get out, reach for a sack, take it over to the trash container, put it in, and leave.

We do not know what weight the jury gave the Coleman testimony. If it were disregarded, however, the other evidence thus far related adds up to strong, albeit circumstantial, support for the guilty verdict.

We turn now to the testimony of the six who had been subjected to hypnosis.

### 1. Carr

Tracy Carr is a sales clerk at a sports shop in the Indianapolis area. On September 26, 1978, several weeks before hypnosis, he signed a statement in the presence of ATF agents. The pertinent part follows:

My name is Tracy Carr; I am 21 years of age and reside at the above address. I am currently working for the Broad Ripple Sports Shop, 1015 E. Westfield Blvd., as a sales clerk and I have worked in this capacity for the past seven months. On or about August 10, 1978, to the best of my memory, I was working at the sport shop and did sell approximately twelve boxes of .445 caliber lead balls to one certain customer. These lead balls were packaged in white rectangular cardboard boxes that were sealed by tape and bore the caliber size on the side of the box. This transaction took place at about 11:00 A.M. The customer entered the store alone. He was about 5′5″ or 5′6″ tall and wore blue jeans and a light blue t-shirt with graffiti. This person had sparse hair on his cheeks as if he was starting to grow a beard. The hair on his chin was longer and appeared to be a goatee.

Mr. Palmer showed me a series of seven photographs bearing the picture of men with beards. I reviewed these pictures and chose # 6 as being the person who I might've sold the lead balls to. I was then shown a black and white mug shot that I recognized as being the same person who was shown in picture # 6, with-

out the beard. After viewing the mug shot photo, I am satisfied that this person is the same customer to whom I sold the lead balls.

This transaction did strike me as being unusual at the time I made the sale due to the large quantity of lead balls he bought. On the day of this transaction the customer came in alone and went directly to the gun cabinet area. He asked me if I had any lead balls. I showed him bags of .451 caliber and also the boxes of .445 caliber. He said the .451 caliber balls would not work. He asked how many boxes of .445 I had. I counted the full inventory and gave him the number. He inquired if I had more and after checking the supply room I told him no. He then indicated that he wanted all that I had and asked for a box to carry them from the store. I did give him a box and finalized the transaction when he paid me in cash. The total price was over $20.00.

Carr was the subject of hypnosis on October 21, 1978. Brooke Appleby, a detective with the Indiana State Police, was the hypnotist. He was familiar with Carr's September 26 statement and testified that he "didn't consider the session with Mr. Carr productive at all, there was nothing, no new information gained whatsoever." The transcript of the hypnotic session supports this conclusion, and Carr's identification of defendant's photograph preceded the hypnotic session.

At trial, Carr identified defendant as the person who bought the lead balls on August 10, 1978 and identified three boxes as part of that sale. These boxes had been found in the search of the trunk of the Impala September 21, and one of the boxes bore a tag with the price and the name of the sports shop on it. We are convinced that the experience of hypnosis did not impair the liability of Carr's testimony, and have no hesitancy in counting it as part of the strong circumstantial case made by the evidence already referred to.

## 2. Jones

Andrew Jones is a mechanic employed by an Indianapolis car dealer. As a result of a contact he initiated (after seeing publicity concerning defendant as a suspect) an ATF agent interviewed him September 29, 1978. Jones declined to give a written statement, citing fear for his family, but indicating he might call in the future. The agent's report of that date narrates the following information given by Jones:

On or about September 5, 1978, while so employed he had he had occasion to repair a vaccum line and perform normal maintenance on a 1976 Ivory colored Mercedes ... owned by Brett Coleman Kimberlin. . . .

While working in the trunk area Jones noticed 2 white boxes, approx. 3″ x 4″ x 2″ containing ".445 cal Mini Balls." The white boxes had the above info which appeared to have been printed with blue or red ink and a hand stamp. Jones could not remember the store or manufacturer's name.

In the back seat of this car while working on the door Jones observed a green and wood-tone sportsman 6 volt lantern battery.

The report also states that Jones selected defendant's photograph as the owner of the car, and, indeed, there appears to be no dispute that it was defendant's Mercedes which Jones repaired.

In a hearing in the absence of the jury, Mrs. Jones related conversations with her husband. The evening after he had worked on defendant's car, he told her of working on it and finding "articles in the trunk that he found rather strange." The evening they saw a picture of defendant on TV, relating his arrest, she testified that, "He told me that he had seen lead shot, a box of tools, a pamphlet discussing the use of explosives and some batteries in the trunk of Mr. Kimberlin's car. . . ." Both conversations preceded the hypnotic session.

Jones was the subject of hypnosis November 1, 1978. The transcript of the session shows his references to details not indicated in the report of the September 29 interview, or the conversation with his wife. Examples were: the dimensions of the battery, and that it was new, a Roy–O–Vac and had a $3.29 price tag on it; the name DuPont and some of the subject matter of the document on explosives; his spilling the lead balls and picking them up; price tags on the boxes, with sixes and nines, and printing. He also described other contents which bear no apparent relevance to this case. Judge Steckler found "that the manner and method of conducting the hypnotic interview was not suggestive of the answers given by the witness." We have reviewed the transcript, and the finding was not clearly erroneous.

Jones' testimony at trial was similar to his responses under hypnosis. In addition, he testified that a DuPont pamphlet in evidence as the kind of safety instructions which would have accompanied Tovex sold in 1975 was similar to the pamphlet he found under the spare tire in the Mercedes, and that the boxes of lead shot found in the trunk of the Impala on September 21 were similar to or the same type as the ones in the trunk of the Mercedes September 5.

Although it is at least possible that the additional details remembered under hypnosis were the product of suggestion or confabulation, and the reliability of that part of his testimony open to question, the facts he told the agent and his wife before hypnosis clearly were not such product. Those facts were significant additions to the circumstantial case against defendant.

## 3. The Graham Electronics Employees

The other four witnesses who were subjected to hypnosis were employees at stores of Graham Electronics. Business records showed that Bruce Quillin took an order for six Mark Time timers from a Charles Martin on August 21, 1978; Peter Laux delivered the timers when Martin came in August 23; David Rogers sold three to a "Thomas" September 2; and Daniel Huffman sold five September 5. They were interviewed early in the investigation of the bombings, September 9 and

10. Each was placed under hypnosis September 11. Each gave a description of the customer in the transaction in which each was involved. The descriptions were not identical, but generally similar. Quillin, Laux, and Rogers recalled a light, or new beard. Quillin recalled his customer asking whether the timer could be converted to complete rather than break a circuit, and Quillin showed him how this could be done. The witnesses made efforts to complete a sketch of the individual, but these are not in the record.

As of September 11, the agents had no suspect. The descriptions given by the Graham clerks caused some officer, apparently of the local police, to suggest defendant as a possible suspect. The agents later obtained a photograph of defendant, using a telephoto lens. This picture of defendant, wearing a beard, was placed with pictures of six other men, each with a beard. The seven photographs were spread out before each Graham employee individually. Quillin, Laux and Rogers picked defendant's picture as having some degree of resemblance to the customer.

Unfortunately no written statement was taken from any of the four before hypnosis. Hence there is no pre-hypnotic record of their recollections to compare with later statements. Each signed a statement in early November, reciting that it was "Made September 9 [10 in one instance] and 19, 1978," suggesting that the contents may not have differed very much. It does not appear that defendant was under suspicion at the time of the hypnotic sessions. The tentative photographic identification occurred more than a week after hypnosis. It seems clear that these hypnotic interviews were genuine attempts to locate a purchaser of these timers and that the agents were not in a position to guide these four toward a description of a suspect.

At trial, Quillin picked defendant's picture out of the group as resembling the customer. Laux did the same initially. Called back on rebuttal at his request, he testified that two photographs in evidence, taken of defendant when arrested September 20, 1978, are "the man who came in the store." Rogers picked defendant's picture out of the group as resembling the customer and said he did not see anybody in the courtroom that resembles the customer. None of the four made a positive in court identification of defendant.

Details of the conversations to which they testified as well as the similarities in description suggested that the customer observed by each was the same individual. Their testimony presumably was given weight, but it was by no means critical to conviction.

■ Bearing in mind the strength of the proof other than the testimony of these six hypnotized witnesses, the lack of any effect of hypnosis on Carr and the importance of his testimony, doubt that the recall of the Graham employees was significantly enhanced by hypnosis, the significant testimony given by Jones consistent with his pre-hypnosis statements, as well as the probability that the jury verdict would have been the same if Jones' testimony had been limited to his pre-hypnosis recall, and that of the Graham employees had been omitted, we are satisfied that the admission of the testimony of these six witnesses affected no substantial right of defendant. FED. R.EVID. 103(a).[4]

## B. PROBLEMS OF EXTENSIVE PUBLICITY

Citing extensive media coverage of the 1978 bombings and defendant's trials and other troubles in the years between the bombings and this third trial, defendant challenges the judge's denial of a change of

---

**4.** We do not imply that there was no defense evidence. Defendant testified. He denied causing the explosions, continued possession of the Tovex and blasting caps after the 1975 work at his property, access to the trunk of the Impala, and other things. He described his activities on the days and evenings of the explosions, and other witnesses testified at least in partial corroboration. If this testimony were fully believed, defendant could not have been at any explosion site within the hour before the explosion. Thus there were many credibility determinations to be made by the jury.

venue, substantial continuance, and sequestration of the jury.

■ Judge Steckler permitted counsel to conduct very thorough *voir dire*. It was clear that most prospective jurors were aware of defendant Kimberlin to some extent. Fifty-one (51) prospective jurors were examined. All but a few had heard of him. Twelve (12) were excused for cause. Twelve (12) jurors and four alternates were ultimately selected. Ten (10) had heard his name. Twelve (12) recalled something about the Speedway explosions, almost three years earlier. Several were aware of accusations against defendant in that connection. None recalled details. None indicated any opinion which would impair the juror's ability to decide the case on the evidence, starting out with the presumption of innocence.

In our opinion, the record and the *voir dire* do not reveal the kind of 'wave of public passion' that would have made a fair trial unlikely. *Patton v. Yount*, 467 U.S. 1025, 1032–33, 104 S.Ct. 2885, 2889–30, 81 L.Ed.2d 847 (1984). *See also United States v. Kampiles*, 609 F.2d 1233, 1239 (7th Cir.1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980).

Before the first (1980) trial, a motion for change of venue had been denied. Conviction resulted on Counts 26–34, relating to unauthorized possession and use of official insignia and impersonation of a federal officer or employee. In an unpublished order, this court affirmed, holding the denial of a change of venue was not error. *United States v. Kimberlin*, No. 80–2634, December 21, 1981, listed at 673 F.2d 1335 [table].

At the second trial, beginning May 18, 1981, the court refused defendant's request for sequestration of the jury. Defendant was convicted of two counts of receipt of an explosive by a convicted felon. This court affirmed, again by unpublished order, holding the refusal to sequester was not an abuse of discretion. *United States v. Kimberlin*, No. 81–1993, October 20, 1982, listed at 692 F.2d 760 [table].

■ Although in this third trial, beginning August 17, 1981, the judge again declined to sequester the jury, he carefully instructed the jury at every recess concerning their duty not to read newspaper accounts regarding the trial, not to listen to radio broadcasts or telecasts, and not to permit persons to talk about the case, and to exclude from consideration any information which might happen to come from sources outside the trial. Defendant has not claimed any actual prejudice arising from failure to sequester. *United States v. Kampiles*, 609 F.2d at 1241. We find no error or abuse of discretion.

C. CLAIMED FAILURE TO PARTICULARIZE SIMILAR COUNTS

■ Counts 1 through 8 charged knowing possession of a firearm not registered to defendant. The language of each count was identical except for the date, which was September 1, 1978 in Counts 1, 2 and 3; September 2 in Count 4; September 3 in Counts 5 and 6; September 5 in Count 7; and September 6 in Count 8.

Counts 9 through 16 formed a similar series, charging knowing manufacture.

There is no claim that any one of these counts, taken alone, failed to charge an offense. The argument is that because there is no differentiation of any firearm from another, and no particularization of any offense except by date as to some, every count is somehow defective.

A sufficient answer is that this proposition was not raised prior to trial as required by Rule 12(b)(2), FED.R.CRIM.P., and was thus waived, Rule 12(f).

D. CLAIMED DENIAL OF SPEEDY TRIAL

Defendant alleges that he was not brought to trial within the time limits prescribed in the Speedy Trial Act, and seeks dismissal pursuant to 18 U.S.C. § 3162(a)(2). Although the government asserts that the Speedy Trial Act excludes adequate segments of the delays which occurred, we need not perform this analysis. The indictment was returned February 28, 1979, and under § 3163(c), § 3162 does not apply to indictments filed before July 1,

1980. There is no claim of an earlier implementation of § 3162 in the Southern District of Indiana under 18 U.S.C. § 3174(c).

■ Defendant also asserts a violation of his constitutional right to a speedy trial, measured under *Barker v. Wingo,* 407 U.S. 514, 515, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972). That decision calls for "a difficult and sensitive balancing process." *Id.* at 533, 92 S.Ct. at 2193. Four factors were identified, though not an exhaustive list: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. at 2192 (footnote omitted).

### 1. Length of Delay

■ Defendant was indicted February 28, 1979. Although he had been arrested September 20, 1978, the arrest was based on the official insignia charges, and not the bombing charges. The official insignia charges were soon dismissed without prejudice. Similar charges were included in the February indictment. Defendant was brought to trial on the bombing counts involved in this appeal (along with the other counts) September 22, 1980, less than nineteen months after indictment. The jury could not agree on the bombing counts. Retrial began August 17, 1981, little more than ten months after the close of the first trial.

Defendant would have us treat the length of delay, for *Barker* purposes, as the almost 30 months from indictment to the retrial. It seems more sensible, however, to deal separately with the nineteen month lapse before the first trial, and ten month lapse from the first trial to the retrial.

The *Barker* Court observed that

[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. [Footnote omitted.] To

take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.

407 U.S. at 530–31, 92 S.Ct. at 2192.

This court has found presumptive prejudice in a nineteen month delay (attempted bank robbery), *United States v. DeTienne,* 468 F.2d 151, 156 (7th Cir.1972), *cert. denied,* 410 U.S. 911, 93 S.Ct. 977, 35 L.Ed.2d 274 (1973), and in a one year delay (assaulting a postal employee), *United States v. Jackson,* 542 F.2d 403, 407 (7th Cir.1976). Although those cases are distinguishable because they were far simpler than this one, we shall assume the nineteen month delay before the first trial and the ten month delay before the retrial are presumptively prejudicial, and weigh the other factors.

### 2. Reason for the Delay

On the day of the indictment, defendant was before a federal court in Texas seeking a reduction in bond. He had been indicted for conspiracy to possess and for importation and possession with intent to distribute four thousand pounds of marijuana. The prosecution in Texas was disposed of June 11, 1980, when he was sentenced on a plea of guilty, to one count, and returned to Indiana June 16. For about three months of the time before disposition in Texas, defendant was in custody at Springfield, Missouri for study, including inquiry into his competency to stand trial.

There seems to be little question that the delay from June 16 to September 22, when trial began, was reasonably necessary for disposition of pre-trial motions.

Although fourteen months of the nineteen month lapse before trial in Indiana would appear to be caused by the disposition in Texas, defendant correctly points out that during much of the time the presiding judge in Texas thought that trial in Indiana should go first. To that end, defendant was transferred to Indiana September 5, 1979, arraigned on September 7, and a trial date set. He was, however, ordered back to Texas October 30, 1979 and

remained there except for the time at Springfield. There seems to have been some inconsistency among the views of the two district judges and two United States Attorneys as to which prosecution should take precedence, but ultimately the one in Texas was resolved first.

Doubtless because defendant made no motion to dismiss for want of speedy trial, the record contains no real explanation why the Texas prosecution went first. We gather that defendant considered the case in Texas as much stronger and that he would have had a better chance of acquittal in Indiana if tried earlier. We are unaware of a constitutional principle whereby one who is accused in two districts has a right to have the weaker case tried first.

3. Defendant's Assertion of His Right

Defendant did not formally demand a speedy trial and made no motion to dismiss on that ground. Had he filed a motion, it would have given him the opportunity to place in the record any evidence to support the assertions in his brief that he "doggedly demanded to be tried in Indiana," or to support his suggestions that the prosecutors and marshals were improperly motivated.

4. Prejudice

Defendant remained incarcerated in Texas because he was unable to post the bond set in Indiana. He asserts prejudice in the discomforts and inconvenience of incarceration, and impairment of ability to contact his Indiana attorneys. He does not claim the loss of a witness or similar specific prejudice during the period before the first trial.

5. Factors Concerning the Delay of Retrial

A substantial portion of the ten month lapse between the first trial and retrial resulted from continuances requested by defendant. The second trial (Counts 23 and 24) ran from May 18 to June 3, 1981. Defendant did not seek an earlier retrial of Counts 1 through 22.

He argues that he was prejudiced by the death of a witness, his brother, Scott Kim-berlin. He asserts that Scott would have corroborated the testimony of defendant and of another witness that Scott Kimberlin had possession of the Tovex after May 1975. Scott was available for the first trial, but defendant says he did not call him because at the first trial the government produced no evidence that defendant retained possession of the Tovex after May, 1975. If the unavailability of Scott had any adverse effect on defendant's case, it cannot fairly be ascribed to the delay in the retrial. Scott was killed only one week after the first trial.

Defendant also claims he was prejudiced by what he describes as the "loss" of the diary of Tina Duerden.

Tina Duerden was an apparently disinterested witness who was employed at a restaurant where defendant and two other witnesses testified they had eaten the evening of September 2, 1978. They testified concerning an incident in which defendant had comforted the young employee, who accidentally broke some dishes, and had given her a substantial tip. At trial it turned out that Tina was in Denmark, and after a telephone conversation, counsel stipulated that if present she would testify that she recalled a similar incident. She could not remember the date, but did "believe I wrote about the incident in a journal." Tina's mother testified that she found "both" journals, but could not find the entry referred to. Obviously it is questionable whether there was any "loss" of a diary, and further, defendant may well have been at the restaurant the evening of September 2 and also have been at the site of explosion No. 5 within the hour before 12:15 AM, September 3, the time it went off.

In summary, we conclude, balancing the factors described, that neither the delay occurring before the first trial, nor the delay between trials, was a denial of defendant's Sixth Amendment speedy trial rights.

Defendant also argues that the forty-five month delay in indictment for the receipt of explosives on May 14, 1975 violated the

Fifth Amendment Due Process Clause. Counts 23 and 24, however, are not before us in Appeal No. 82–1025.

### E. Claim Of Suggestive Photographic Identification

As already stated, Carr identified defendant in court as the customer who purchased lead shot. Of the four Graham employees, Quillin and Laux testified that defendant resembled the customer who ordered and picked up timers. Rogers testified that defendant's picture resembled his customer. It was proved that in 1978, Carr, Quillin, Laux, and Rogers had selected defendant's picture out of a group of seven. Huffman made no identification of any sort.

■ Defendant argues that the district court erred in denying his motion to suppress this evidence because the pre-trial identification procedure had been impermissibly suggestive.

The procedure was substantially identical for each witness. The agents spread out the seven photographs before each witness, individually. They asked if the witness could identify the customer.

The witnesses had referred to a beard, terming it light, new, beginning, or sparse. They had observed their customer at various dates, from August 10 to September 2. The picture of defendant, taken after September 11, and before September 19, showed a beard, and the agents obtained pictures of six other young white men, with beards.

Defendant's picture had been taken with a telephoto lens, and enlarged. Although there was testimony that it appeared grainier than the others, our own examination shows little difference, except that an object in the background of the picture is not clear. Any difference does not appear to us to convey the suggestion that defendant's photograph must be of the person believed by the agents to be the customer. *Cf. United States v. Bubar*, 567 F.2d 192, 198 (2nd Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977).

The lower portion of the pictures had been covered with tape. An agent explained that "[t]he tape was applied to these photographs to cover up the dress of each individual in the photograph and, more specifically, to cover up the fact that the T-shirt worn by Mr. Kimberlin has a design on it." Witnesses Rogers and Carr had referred to a design on the T-shirt worn by the customer.

Although very little of the individual's clothing appeared on any picture, defendant's showed enough to indicate his shirt was a T-shirt. The other shirts appeared to have some type of attached collar. Witnesses Rogers, Quillin, and Carr had said the customer was wearing a T-shirt. Laux said his customer had worn a blue jean shirt or jacket.

The situation is readily distinguishable from *United States v. Baykowski*, 583 F.2d 1046 (8th Cir.1978), where it was found suggestive for the police to show the victim photographs of six people, one of whom was wearing a sweater like the one reported stolen from the victim's home.

We do not find the procedure so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972), adapting the standard expressed in *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

■ After witness Carr had selected defendant's photograph as resembling his customer, the agents showed one picture of defendant. It had been taken earlier, when defendant had no beard. The single picture was shown in other instances, as well. In each case, the witness expressed a more definite opinion after seeing the unbearded photograph, although only Carr indicated certainty. We do not consider that this showing of a single picture of the individual initially selected tainted the process, particularly since the bearded picture first shown had been taken a substantial period after each witness had observed his customer with a new beard. Carr, for example, had seen his customer August 10, and

228

had said, "This person had sparse hair on his cheeks as if he was starting to grow a beard. The hair on his chin was longer and appeared to be a goatee."

### F. CLAIMED INVALIDITY OF SEARCH WARRANTS

#### 1. The Impala

Defendant challenges the validity of two search warrants authorizing search of the Impala. He had made pre-trial motions to suppress. He was arrested by an FBI agent the afternoon of September 20 for impersonating a federal officer and misuse of the seal of the President. On the morning of the 21st, FBI Agent Lucas obtained the first warrant. The magistrate found probable cause to believe that official badges, identification cards, and other insignia of the design prescribed by the Department of Defense and facsimilies of the Seal of the President, possessed and used in violation of 18 U.S.C. § 701 and § 713, were being concealed in the Impala. During the day the ATF agents who knew that defendant was a suspect in the bombings and the FBI agents involved in his arrest on the insignia charges became aware of each other's interest. ATF agents were present when the search was made. ATF Agent Donovan observed timers, lead shot, and a six-volt battery, among other things, in the trunk of the Impala. He then obtained the second warrant to search the car, and the search was made the evening of the 21st.

The challenge to the second warrant, obtained on the basis of observations during the first search, depends wholly on the alleged invalidity of the first warrant.

■ a. Defendant argues that Agent Lucas' affidavit for the first warrant did not demonstrate probable cause.

b. The affidavit was carefully detailed. Personal observations and information from named officers and others were described. Complete repetition here is unnecessary. Lucas had been called to a printing establishment. He observed defendant wearing clothing with badges and insignia.

The insignia was identical to that of the Security Police of the Defense Department. Defendant had in hand a facsimile of the Presidential Seal and other documents, one or more of which he attempted to chew up. He had been at the establishment the day before to have copies of the documents printed. He had been wearing the same clothing. At the printer's instructions, he had returned to give final approval of the layout. Army investigators were also present. They had just previously observed defendant drive the Impala into the parking lot and enter the establishment. The Impala had remained there since defendant's arrest.

Concededly, Agent Lucas did not claim that anyone had observed badges, identification cards, insignia, or facsimiles within the Impala. The documents he had seen in defendant's possession had been in the print shop since the day before. Under the circumstances, however, it seems reasonable to believe that similar badges and documents and related items had been left inside the automobile. We think the magistrate could reasonably find probable cause.

"In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949), *quoted in Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983).

In any event, the officers relied on the warrant, and if there be any gap between Agent Lucas' observations of defendant's possession of insignia and the like in the print shop, and the presence of similar items in the automobile, we think reliance was objectively reasonable. *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3423, 82 L.Ed.2d 677 (1984).

■ c. The Impala remained at the printing shop after the arrest of defendant. On the morning of September 21, an FBI

agent was sent to secure it until the search warrant could be obtained and the search conducted. Defendant's lawyer arranged to have the car towed, but the agent did not permit the removal.

Defendant argues that this interference with his control of the car was an unreasonable seizure in violation of the Fourth Amendment, requiring suppression of the results of the search.

We think it clear that when an officer has probable cause to search a vehicle, it is reasonable under the Fourth Amendment to prevent removal while obtaining a warrant. *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1970); *Segura v. United States,* 468 U.S. 796, 811, 104 S.Ct. 3380, 3389, 82 L.Ed.2d 599 (1984).

 d. Defendant argues, in substance, that the officers cared nothing about additional evidence of impersonation and illegal use of official insignia and that the application for a search warrant for those items was only a subterfuge to search for evidence of the bombings. He cites *Taglavore v. United States,* 291 F.2d 262 (9th Cir.1961). In that case a vice squad officer suspected an individual of possessing marijuana cigarettes. He obtained an arrest warrant on the basis of having observed the individual commit two minor traffic violations. This was admittedly an unusual procedure. He gave the warrant to two officers for execution, warning them that the individual might well have marijuana cigarettes. The opinion indicates that the court was impressed by the use of considerable force in seizing a cigarette. The Ninth Circuit found a "violation of a constitutional right by a subterfuge." *Id.* at 266.

The facts of this case are substantially different. Here Judge Steckler found that "the first warrant was not obtained ... on the pretext to conduct an unlawful search and seizure of the timers and other evidence that was ultimately obtained through issuance of the second search warrant." Although the offenses indicated in the first warrant were only misdemeanors, they were not trivial, and the FBI had a legit-imate interest in pursuing them. The search did yield materials relevant to these offenses. Although the original arrest charges were soon dismissed, they were included in the indictment five months later.

The ATF agents, for whom defendant had become a suspect in the bombings, were understandably interested in determining whether the Impala contained evidence which would assist in their investigation. We are not persuaded that their interest in and presence at the search, or even their having encouraged the search, if they did so, made the search under the first warrant unreasonable. Nor do we see any basis for defendant's contention that the interest of the ATF agents must be disclosed to the magistrate when the warrant was applied for.

## 2. Defendant's Home

We do not consider defendant's challenge to the validity of a warrant to search his house. Admittedly no objection to that search was made in the district court on Fourth Amendment grounds.

## 3. The Mercedes

 A magistrate in the Southern District of Ohio issued a warrant on December 1, 1978 for the search of defendant's Mercedes. Defendant moved to suppress evidence derived from that search, challenging the validity of the warrant.

Some of the information used to obtain the Ohio warrant came from the second search of the Impala. We have already disposed of the claim that that warrant was invalid.

Defendant also argues that the facts before the Ohio magistrate could not support a determination of probable cause.

ATF Agent Donovan's affidavit was before the magistrate. Summarizing, it showed:

Defendant received Tovex in 1975. Eight bombing incidents occurred September 1 through 6, 1978. Each bomb was comprised of a Mark Time timer, a Ray-O-Vac Sportsman dry cell battery, an electric

blasting cap, and DuPont Tovex. Two of them contained lead balls consistent with .445 caliber lead balls. On September 5, Andy Jones observed in defendant's Mercedes a Ray–O–Vac battery, a box of .445 caliber lead balls and a DuPont explosive information pamphlet. Defendant purchased a Chevrolet [Impala] in Dayton, Ohio September 13, 1978. He left the Mercedes parked in Dayton until he was asked to move it. It was brought to a body shop in Miamisburg for work. It remained at the shop on December 1. On September 21, a search of the Impala had produced three boxes of .445 lead balls, four Mark Time timers, altered to operate the same way as those used in the bombings, "as well as positive traces of the explosive material Tovex which were recovered by means of swabbing and sweeping, with the residue being identified by means of laboratory analysis." A chemist advised on November 29 that traces of DuPont Tovex could still be found in a vehicle that had contained Tovex during the first week of September, 1978.

We think the magistrate could reasonably determine from the facts in the affidavit that the Mercedes probably had contained bomb components in early September which were moved to the Impala about September 13; that it probably had contained Tovex; and that traces would remain on December 1.

Defendant also claims the affiant intentionally misrepresented that an Ohio car dealer had asserted that defendant purchased the Impala September 13, 1978 under the name of Eaton. It is true that at the first trial in 1980 the dealer identified an individual other than defendant as the purchaser. Before the December 1, 1978 affidavit, however, he had identified defendant's photograph as a picture of the purchaser. The purchaser had used the name of Eaton. Thus the statement in the affidavit was not an intentional misrepresentation.

As argued on appeal by defendant, the affidavit did not disclose that some of the information ascribed to Andy Jones had been elicited while Jones was under hypnosis. Although this fact is relevant at trial to the credibility of Jones' testimony, and arguably could have a bearing on the reliability of information obtained from Jones, the omission did not amount, in our opinion, to a false statement. Moreover, this point was not presented to the district court.

### G. CLAIMS OF DOUBLE JEOPARDY

Defendant makes two arguments based on the guaranty against double jeopardy.

#### 1.

He asserts that the evidence at the first trial was insufficient as a matter of law to support a verdict of guilty. Relying on *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), he contends that retrial resulted in second jeopardy and was therefore barred.

Defendant's brief on the insufficiency of the evidence at the first trial is not persuasive. We are satisfied, however, that we need not examine that record.

More recent decisions, distinguishing *Burks,* make it plain that "a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected.... Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial." *Richardson v. United States,* 468 U.S. 317, 326, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984), *quoting* 104 S.Ct. at page 3085, *Justices of Boston Municipal Court v. Lydon,* 466 U.S. 294, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (footnote omitted).

#### 2.

At the second trial the government introduced evidence not presented at the first trial. Defendant argues without citation of apposite authority, that this subjected him to double jeopardy.

*Richardson* established that retrial after a trial at which the jury could not agree was a continuation of original jeopardy, and we see no theory under which

strengthening the case at the second trial changes that proposition.

Defendant has brought to our attention *United States v. Gulledge,* 739 F.2d 582 (11th Cir.1984), dismissing an interlocutory appeal based on claims that a second trial would be second jeopardy because of insufficiency of evidence at the first trial, and that the double jeopardy clause would bar additional evidence at the second trial. Defendant relies on language in *Gulledge* indicating that the additional evidence point could be raised on appeal from the final judgment. If the language suggests that such claim would have possible merit, we think the suggestion could not be squared with *Richardson.*

### H. EVIDENCE USED IN OTHER TRIALS

#### 1.

Defendant argues that the government was collaterally estopped from producing evidence tending to prove his possession of the Impala, and responsibility for items found in the trunk. Although possession of the Impala was not an element of the offenses charged in Counts 1 to 22, the materials found in it were highly significant in the circumstantial case.

At the 1980 trial of all counts, defendant was acquitted of Count 25. There it was charged that he, having been convicted of perjury, knowingly transported two boxes of .223 caliber Remington ammunition from Ohio to Indiana.

The government's proof was that this ammunition was found in the Impala in the search on September 21 in Indianapolis; that like ammunition had been sold a few days earlier to a person, not identified, by a store in Dayton, Ohio; that defendant was observed driving the Impala in Dayton September 17, and in Indianapolis September 21. The government also proved that a person using the name Eaton purchased the Impala in Dayton on September 13 from a dealer named Wiltheiss. The government expected Wiltheiss to identify defendant as the purchaser, but he identified someone else at the first trial. There was other evidence, however, of defendant's driving the car in Ohio.

The government expected the jury to infer from defendant's possession of the car in Ohio and later in Indiana, the purchase of the ammunition in Ohio and its later presence in Indiana, that defendant, or someone acting for him, had driven the car from Ohio to Indiana, and that defendant knew the ammunition was in the car.

The jury did not oblige and acquitted on some theory.

The jury verdict established that defendant was not guilty of knowingly transporting the ammunition from Ohio to Indiana on or about September 21. That broad issue is irrelevant to Counts 1 through 22. The question raised by defendant is really whether some narrower issue was necessarily determined by the verdict on Count 25 so that the government is precluded from relitigating that narrower issue in the course of its proof of Counts 1 through 22.

In the first trial the government had offered evidence to show defendant purchased the Impala in Ohio (the seller failed to identify defendant as the buyer), that he had driven it in Ohio and later in Indiana, and that the ammunition purchased in Ohio was in the car trunk in Indiana. In the instant trial, items appearing to be bomb components were found in the trunk, and the government offered proof that defendant had driven the car in Ohio, and later in Indiana. Defendant contended in the district court that the verdict of acquittal could only have been based on a reasonable doubt "as to whether he did purchase, possess and drive that car." Accordingly, he contended, evidence that he did so must be excluded from the present case.

In *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) the Supreme Court decided that the federal rule of collateral estoppel is embodied in the Fifth Amendment guaranty against double jeopardy. The Court defined the rule as "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated

between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. at 1194.[5]

Although the Court used the phrase "issue of ultimate fact" in its definition, it stated the test to be applied to the full record of the earlier case, as "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." It has been phrased elsewhere as whether the particular fact was necessarily determined against the government on the first trial. *United States v. Kramer,* 289 F.2d 909, 916 (2d Cir.1961). *See Sealfon v. United States,* 332 U.S. 575, 580, 68 S.Ct. 237, 240, 92 L.Ed. 180 (1948) ("necessarily adjudicated"); *United States v. Whitaker,* 702 F.2d 901, 903 (11th Cir. 1983) ("necessarily established"); *United States v. Mock,* 604 F.2d 341, 345–46 (5th Cir.1979). The Supreme Court in *Yates v. United States,* 354 U.S. 298, 336, 77 S.Ct. 1064, 1085–86, 1 L.Ed.2d 1356 (1957) has said that the collateral estoppel doctrine "makes conclusive in subsequent proceedings only determinations of facts, and mixed fact and law, that were essential to the decision."

"At the outset, then, the defendant must carry the burden of proving that the factfinder acquitted him because it resolved in his favor the very issue that he seeks to foreclose from consideration in the second trial." *United States v. Mespoulede,* 597 F.2d 329, 333 (2d Cir.1979) (citation omitted).

In speaking on this subject, this court has used the term "issue of ultimate fact." *United States v. Castro,* 629 F.2d 456, 465 (7th Cir.1980). The Eighth Circuit has noted a division of opinion whether collateral estoppel bars only the relitigation of ultimate facts or evidentiary facts as well. *United States v. Riley,* 684 F.2d 542, 546 (8th Cir.), *cert. denied,* 459 U.S. 1111, 103 S.Ct. 742, 74 L.Ed.2d 962 (1982). It seems to us that however the issue be classified, the critical question is whether it can be said with assurance that the fact was nec-

essarily established by the judgment at the earlier trial.

Clearly defendant's possession or use of the automobile in Ohio or Indiana was not an "ultimate fact" in the ordinary sense at the trial of Count 25. It cannot be said, either, that the acquittal necessarily determined that he did not have possession in Ohio, or in Indiana, or drive it from one to the other. The jury may simply have been unwilling to draw the inference that it was defendant who purchased the ammunition in Ohio, or obtained it from the buyer, or at least knew that the ammunition was in the car during the interstate trip.

2.

At the 1980 trial the jury was unable to reach a verdict on Counts 1 through 22, based on the 1978 bombing, and on Counts 23 and 24. The latter two charged that defendant, having been convicted of perjury, received explosives (which had been transported in interstate commerce) on or about May 14, 1975. (Tovex in Count 23 and blasting caps in Count 24). Before retrial, Counts 23 and 24 were severed. Defendant was convicted of them at the second trial (May-June 1981).

At the third trial (of Counts 1 through 22) the government proved defendant's receipt of the explosives in May, 1975. Defendant argues he was denied due process, and that there was inconsistency between severance of Counts 23 and 24, and the use of the same evidence at trial of Counts 1 through 22.

We do not pause long with this argument. In trying Counts 23 and 24, defendant's conviction of perjury would necessarily be admitted in evidence. It would not be admissible in trial of Counts 1 through 22 unless defendant testified, and he had not done so at the first trial. In arguing for severance, defense counsel had so noted. The evidence tending to prove defendant's responsibility for the explosions would be part of the trial of Counts 1

---

5. The Court has since decided that the "contemporary doctrine of nonmutual collateral estoppel" does not apply against the government in criminal cases. *Standefer v. United States,* 447 U.S. 10, 21–26, 100 S.Ct. 1999, 2006–09, 64 L.Ed.2d 689 (1980).

through 22, but would be irrelevant in a trial confined to Counts 23 and 24.

Severance did not preclude the use of the purchase of explosives at the trial on Counts 1 through 22. We reject the argument that such proof was irrelevant on those counts, and that its probative value was outweighed by the danger of unfair prejudice.

### 3.

■ The government produced evidence that defendant purchased and possessed uniforms, badges, and other items related to his impersonation of Defense Department security personnel. He was engaged in this project at the time of his arrest, moments after stepping out of the Impala which he had driven to the scene.

Defendant objected, and argues that the evidence was irrelevant, or at least that its probative value was substantially outweighed by the danger of unfair prejudice.

Other evidence very clearly showed that defendant had driven the Impala in Ohio and Indiana as early as September 13 and as late as September 20. When he took the stand he so testified. A very much disputed issue was whether he had access to the trunk of the vehicle, where the incriminating evidence was found.

■ The fact that some of the "impersonation" items were also found in the trunk made highly relevant and probative on this issue of access the evidence that defendant purchased and possessed such materials. We are also satisfied that possible unfair prejudice did not outweigh their probative value. Defendant argues that the admission of the impersonation material forced him to offer an explanation. The explanation was that they were to be used to facilitate a marijuana smuggling operation he was carrying on, centered in Texas. Under the circumstances, we do not agree that possible prejudice from his explanation was chargeable to the government, or caused the probative value of this evidence to be outweighed.

Some of the arguments by both counsel have dealt with Rule 404(b), FED.R.EVID., "Other crimes, wrongs, or acts." Although that Rule prohibits use of other crimes evidence "to prove the character of a person in order to show that he acted in conformity therewith," the Rule permits use for other purposes. The relevance of the evidence with which we are concerned (to prove defendant's access to the trunk) does not fit into any of the matters listed as other purposes, but the list is not exclusive, and the purpose for which the evidence was used here was entirely proper.

### I. CLAIM OF DENIAL OF DUE PROCESS BY USE OF WITNESS COLEMAN

Reference has been made to the testimony of Lynn Coleman. Coleman had not testified at the 1980 trial. He was called by the government at the third trial and identified Kimberlin as the person he had seen at the site of the September 1 explosion. Defense trial counsel made no objection nor motion to strike.

Defendant appears to argue that defendant was entitled to notice in advance concerning Coleman. "It is clear, however, that not even under Rule 16 is a defendant in a noncapital case entitled to lists of prospective government witnesses." *United States v. Bouye*, 688 F.2d 471, 473–74 (7th Cir.1982) (citations omitted).

■ Coleman testified that no government agent had shown him a picture of defendant. He had seen defendant's picture on television at the time of his arrest and later. We do not agree that that type of observation triggers a due process right to judicial evaluation of the reliability of the in-court identification under *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

Defendant now argues that the court should have given a greater portion of the instruction on identification recommended in *United States v. Telfaire*, 469 F.2d 552, 558 (D.C.Cir.1972). This claim was waived by failure to object.

■ Coleman testified late on a Friday. After considerable cross-examination his

counsel asked the court, because the testimony was unexpected, to continue cross-examination until Monday. Counsel wished to have time for investigation. The court denied the request. After colloquy in which the court suggested the possibility of opening the record for further cross-examination, counsel withdrew the request. The court later said, "If there is any basis to open the Government's case in chief for the purpose of allowing further cross-examination of Mr. Coleman, counsel are at liberty to put that request before the Court." No request was made during the four weeks of trial thereafter. On this record, cross-examination was not improperly limited.

As Coleman left the court, he was given a notice of deposition in a civil case in state court brought against defendant by individuals injured in one of the explosions. The deposition was to be taken the next afternoon. On motion of the government, the district court ordered defendant to direct his attorney in the civil case to stay the deposition until further order. Judge Steckler added that his order would cease when counsel for the government and defendant appeared before the state court and gave the state court an opportunity to determine whether the deposition should go forward.

There is conflict between the liberality of discovery in a civil case and the purpose of restrictions on discovery in a criminal case. *See, e.g., Campbell v. Eastland,* 307 F.2d 478, 487 (5th Cir.1962). In any event, this order did not impair any right Mr. Kimberlin had as a defendant in the criminal case.

### J. MISCELLANEOUS CLAIMS OF GOVERNMENT MISCONDUCT

#### 1. Use of Prior Convictions for Impeachment

Defendant testified. During direct examination he testified that he had been convicted of perjury. Defendant argues that the government improperly inquired on cross-examination concerning the details of the offense. On direct, for the obvious purpose of minimizing the offense, and its impact on the jury, defendant testified he was convicted when he had just turned eighteen, the grand jury was investigating drug abuse at the high school, and no lawyer was with him when questioned before the grand jury. Apparently believing that the door had been opened, the prosecutor inquired whether the perjury consisted of telling the grand jury he had not sold LSD to certain persons when in fact he had done so. The answer was affirmative. No objection was made. We think there was no plain error, if error at all. *See United States v. Barnes,* 622 F.2d 107, 109 (5th Cir.1980); *United States v. Wolf,* 561 F.2d 1376, 1381 (10th Cir.1977).

On cross-examination the government also brought out the convictions of Counts 26 through 34 (the impersonation and insignia counts) which had resulted from the 1980, first, trial. Although defendant had earlier sought a ruling on admissibility, the court deemed the motion premature, and there was no objection when the testimony was elicited.

■■■ On appeal defendant appears to argue that convictions which occurred at the same trial which resulted in mistrial as to Counts 1 through 22 could not be brought out on retrial of the latter.

In a sense, it was fortuitous that the convictions on Counts 26 through 34 had occurred before the defendant testified concerning Counts 1 through 22 at retrial. Nevertheless we are aware of no principle which prevented their use as impeachment. Defendant cites only *United States v. Burkhead,* 646 F.2d 1283 (8th Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981), but the circumstances were different, and the type of unfairness perceived by the court in that case did not exist in this one.

Counts 31 through 34 charged felonies. Although Counts 26 through 30 charged misdemeanors, defendant raised no question whether the misdemeanor convictions were admissible under Rule 609(a)(2) as involving dishonesty or false statement.

#### 2. Defendant's Possession of Weapons

On cross-examination of defendant, the government inquired concerning his posses-

sion or involvement with a number of weapons. In part he admitted and explained and in part he denied possession or involvement. Insofar as credibility was the only consideration, defendant is correct in saying that his answers could not be disproved by extrinsic evidence. Rule 608, FED.R.EVID. On rebuttal, however, the government offered evidence concerning his possession of weapons.

ATF Agent Donovan testified that in a search of defendant's home September 23, 1978, he found a .22 caliber rifle and two shotguns, a box of 12 gauge shotgun shells, a box of .22 caliber ammunition, and a clip containing four .30 caliber rounds. Twelve (12) gauge shotgun shells and 30.06 ammunition had also been found in the Impala. This evidence came in without objection.

Scott Bixler was a co-defendant with defendant Kimberlin in the Texas marijuana case. In rebuttal he testified that in the summer of 1978 he purchased seven AR–15 rifles at $300 each. Defendant Kimberlin supplied the money, and Bixler turned six of the rifles over to him. Days before, Bixler had purchased a shotgun for defendant Kimberlin. This testimony came in without objection. There was testimony that an AR–15 was found at the Patricia Strait residence in Texas, along with apparent bomb components, and that the serial number on the rifle was scratched through. This evidence came in without objection.

On redirect, Bixler testified, over objection, that he and defendant Kimberlin had shot a semi-automatic .22 caliber pistol with a silencer on the end of it. Kimberlin had provided this weapon. They shot it at the "airstrip," a location which figured in the marijuana operation.

In overruling the objection to the last mentioned Bixler testimony, the court told the jury the evidence could be considered only as to "predisposition and intent."

 For several reasons, we find no reversible error.

a. The possession of a pistol with a silencer is at least marginally relevant to the intent necessary to convict on Counts 17 through 22. 18 U.S.C. § 844(f) requires that damaging or destroying the property described by means of an explosive must be maliciously accomplished.

It is true that defendant here contended that he was not the person who caused the explosions and raised no direct issue concerning intent.

This court has stated, however, that "[w]hen the crime charged requires proof of specific intent, we have held that, because it is a material element to be proved by the government, it is necessarily in issue and the government may submit evidence of other acts in an attempt to establish the matter in its case-in-chief, assuming the other requirements of Rules 404(b) and 403 are satisfied." *United States v. Shackleford*, 738 F.2d 776, 781 (7th Cir. 1984) (citation omitted).

b. Repeatedly in the course of the defense case, episodes were brought out which tended to show defendant as a gentle, caring person.

For example, the defendant and other witnesses repeatedly described his regular and frequent periods of transcendental meditation. His alibi for one explosion starts out with his taking the teenage daughter and niece of friends on a shopping trip and to dinner. While at dinner there was an incident in which the defendant comforted and gave a generous tip to a young employee of the restaurant who had dropped a tray of dishes. Another alibi witness described the warmth of defendant's response to the witness' three-year-old daughter.

Although some of these instances were integral parts of alibi testimony, some were not. Taken together, they clearly suggest the inference that defendant was not likely to have the intent, general or specific, to carry out the bombings. In these circumstances, it seems fair that the government be able to rebut by proof that defendant possessed many firearms, including a pistol with a silencer. *Cf. United States v. Johnson*, 634 F.2d 735, 737 (4th Cir.1980),

*cert. denied,* 451 U.S. 907, 101 S.Ct. 1974, 68 L.Ed.2d 295 (1981).

c. One prong of the defense was repeatedly to suggest the suspicion that Scott Bixler was really the bomber, and was responsible for the components found in the trunk of the Impala. The defense included testimony that defendant's deceased brother, Scott Kimberlin, and Scott Bixler were very close friends; that Scott Kimberlin had possession of the Tovex after May, 1975, and was "flaky" and "irresponsible"; that Scott Bixler had been overheard making a statement to Scott Kimberlin which sounded like an expression of regret for the personal injury which occurred in one of the explosions. Defendant testified that he had borrowed the Impala in Dayton about September 15th or 16th; he got it from a friend of Scott Kimberlin's, by arrangement with Scott and that he had turned it over to Scott Bixler about two days before defendant was arrested September 20.[6]

During the government's case-in-chief, the defense, while cross-examining an ATF agent, had introduced documentary evidence showing that Bixler had purchased the seven AR–15 rifles. The defense also brought out that this rifle uses .223 caliber ammunition and that .223 ammunition had been found in the Impala. Bixler's testimony was an explanation of the transaction the defense had proved.

On cross-examination of Bixler, the defense had asked whether he had used any weapons in Texas in February of 1979, and he had said, "Yes." On redirect, the government elicited his testimony concerning the use of the pistol with a silencer as an explanation of his earlier response. It seems to us, under the circumstances, a legitimate explanation of an answer elicited by the defense, although that justification was not asserted by the defense, or adopted by the court.

d. The testimony concerning defendant's possession of the AR–15 rifles, and the weapons and ammunition found in his home came in without objection. Assuming error in the admission of the Bixler testimony concerning the pistol and silencer, we conclude that such testimony did not affect the outcome, and the error, if any, was harmless.

3. Claim That Defendant Properly Invoked Fifth Amendment

Defendant asserted his privilege against self-incrimination during cross-examination. He had testified on direct by way of alibi that he had driven from Indianapolis to Dayton the evening of September 6, 1978, and had stayed at the home of a lady friend, who took him to the airport the next day, September 7. He then flew to Texas. In explaining how he obtained possession of the Impala, he testified that after four or five days in Texas, he flew back to Dayton, and arranged, through his brother, Scott, to borrow the Impala from a friend of Scott's.

Defendant refused to answer questions asking the name of the friends he met in Texas, his destination, whether he knew the individuals in certain pictures, and whether he knew Lorenzo Reyes, Francisco Gonzales, or Rodriquez Cantu.

After the first two refusals there was a hearing outside the presence of the jury after which the court directed defendant to answer. The defendant persisted in refusal. Judge Steckler instructed the jury that the refusal may be considered in determining credibility and the weight of his testimony. The prosecutor commented in final argument. Defendant argues that his invocation of the privilege was proper and should not have been held against him.

At the hearing on the matter, defendant testified that while in Texas, he had talks with other individuals; that the discussions pertained to more than one foreign country, to airplane flights other than commer-

6. The suggestions concerning Bixler were sufficiently pointed that the government saw fit to prove an alibi for Bixler covering one or more of the explosions. Bixler denied that he had

borrowed the Impala before September 20, as defendant claimed. He also denied making the statement concerning injury.

cial; and that whether or not the discussions included marijuana, they involved something other than or in addition to marijuana.

Of course the questions asked involved only names and destination, not the subject matter of any conversations.

The appropriate test is whether "the witness has reasonable cause to apprehend danger from a direct answer." (Citation omitted.) "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *Ryan v. C.I.R.*, 568 F.2d 531, 539 (7th Cir.1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978); *United States v. Melchor Moreno*, 536 F.2d 1042, 1046–47 (5th Cir.1976).

The burden on defendant in this case is somewhat heavier because he had been convicted in a federal court in Texas of conspiracy with others from on or about February 7, 1979 to on or about February 16, 1979 to possess marijuana with an intent to distribute. Another count, dismissed with prejudice, charged him and others with unlawful importation of marijuana on February 15. If the conversations he had on his September 7 trip were incidental to the conspiracy of which he was convicted, they could not be the basis of a new prosecution, and defendant could incur no danger in testifying. On this point, defendant merely called attention to the period of time between September 7 and February 7, 1979 and testified that in September he talked to individuals other than or in addition to his co-defendants in the February indictment.

Bearing in mind that the questions asked only for names and destination, we do not think defendant carried his burden of demonstrating reasonable cause to apprehend danger.

■ In any event a defendant who testifies waives the privilege as to all matters reasonably related to the subject matter of his direct examination. *Neely v. Israel*, 715 F.2d 1261, 1263–64 (7th Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984).

■ As already indicated he had testified to the trip to Texas in close connection with his trip to Dayton which, if his testimony as to time en route were believed, would have made it impossible for him to have been present when the timer was set for explosion No. 8. He had also linked the trip to Texas with his explanation of borrowing the Impala from someone whose name he did not know. Getting possession of the Impala in a way consistent with his not being responsible for the contents of its trunk was most important to his defense.

We think the question as to destination and names of friends he met were reasonably related to the subject matter of his direct examination.

Defendant relies on the provision of Rule 608(b), FED.R.EVID., negating waiver when the witness is "examined with respect to matters which relate only to credibility." As already noted, the testimony as to the Texas trip was closely related to such important substantive issues as an alibi, and avoiding linkage with very significant evidence of guilt.

Moreover, in rebuttal, the government called Francisco Gonzales, one of the individuals inquired about, who testified that between sometime in September, 1978 and the beginning of December, he and defendant had traveled from Beeville, Texas to Austin, Texas. At defendant's direction, Gonzales drove him to a place in the general area of the Patricia Strait home, where apparent bomb components were later found. Defendant told Gonzales to drop him off and come back in about fifteen minutes. In final argument the prosecutor suggested that defendant's refusal to answer had avoided disclosure of the trip with Gonzales and the hiding of the bomb components at the Strait home.

By hindsight it seems likely that the prosecutor had hoped to get answers lending support to the proposition that defendant had hidden the bomb components at the Strait home.

Finally, in this particular case, the defendant's waiver of the privilege was somewhat broader than waiver based only on his taking the stand.

In direct testimony defendant explained the purpose of some of the items found when the Impala was searched. Flares found there "were to be used for a clandestine airstrip to smuggle marijuana, bring an airplane in." He testified that he had purchased uniforms and insignia in Dayton September 14 or 15, "and they were to be used for an international marijuana smuggling operation." He had made the trip to Texas immediately before purchase of these items. It seems highly probable that they were purchased to carry out plans made in Texas a few days earlier, and his testimony waived the privilege as to any marijuana importing conspiracy formed or existing on September 7, whether or not the same conspiracy continued until February.

We conclude there was no error in the court's treating the defendant's claim of privilege as unjustified.

### 4. Claim of Comments on Defendant's Silence

FBI Agent Lucas described the circumstances of his confrontation with defendant at the print shop on September 20, 1978. As previously noted, this episode was relevant to Counts 1 through 22 because it linked defendant to the Impala in which apparent bomb components were found.

Agent Lucas observed defendant's conversation with the proprietor of the print shop. Lucas then identified himself. He testified:

At that time he [defendant] never replied to my questions. I asked him who he was or could he show me some identification. He wouldn't reply to those questions.

I then asked him why he needed these documents or what would he do with them and, since he had the appearance of being an official, what was he an official there for, and he never gave me an answer to any of those questions.

We shall refer to this as Testimony I.

Lucas then described patting defendant down, defendant's stepping on one of the documents and eating another. At that point, Lucas arrested defendant and read him his rights.

When asked whether Lucas had a discussion with defendant, Lucas responded, "We had a discussion, but it was really a one-sided discussion. It was me asking him questions and him not willing to answer." Testimony II.

Later Lucas instructed defendant "that he could make arrangements to have his car moved or we would move it for him, if he wished. Since he would not acknowledge owning the car, he stated that he had no interest in it." Testimony III.

No objection was interposed until, after Testimony III, defense counsel moved for a mistrial, relying on *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). His motion was based on Testimony II and III, and he expressly acknowledged that there was no cause for objection to Testimony I.

Judge Steckler denied the motion, indicating that the content of the testimony did not demonstrate a violation of *Doyle*. He inquired whether either side wanted a cautionary instruction and both said they did not.

*Doyle, United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), and *United States v. Shue*, 766 F.2d 1122 (7th Cir.1985), involve more than testimony recounting that an accused, after being informed of his right to silence, remained silent. The facts of each case included affirmative use by the prosecutor of the accused's silence to impeach a defendant's exculpatory story. In this case there was no such use nor comment by the prosecutor.

Testimony I, as noted, was considered unobjectionable by defense counsel.

 Testimony II, although capable of being read as stating that there had been a series of questions met with silence by the defendant, could also mean that no responsive answers had been given. Agent Lucas asserted this meaning in testimony in the absence of the jury. Even if the jury understood Lucas as saying defendant was silent in the face of questions immediately after arrest, it heard Agent Lucas testify that he had discussions later at the FBI office in which defendant answered questions. It also heard Agent Melchiori testify that he had custody of defendant for an hour at the scene of the arrest, and had discussions with him during that time. When defendant was asked whether he had discussions with these agents on that day, he testified, "We talked a little bit." Testimony II does not focus on any fact as to which defendant remained silent or refused to answer. Reading Testimony II as a *Doyle* violation, however, we find it harmless beyond a reasonable doubt.

Testimony III clearly related a statement by defendant that he had no interest in the car. That was not silence. *Phelps v. Duckworth*, 772 F.2d 1410, 1410–13 (7th Cir.1985) (*en banc*). Defendant's present claim rests entirely on a vague implication from the introductory clause that the agent asked defendant about the ownership of the car and defendant remained silent or orally refused to answer.

*United States v. Williams*, 665 F.2d 107, 109 (6th Cir.1981) held it was plain error to admit an agent's testimony that defendant had refused to answer specific questions about the price he paid for an item and its source. This court, pre-*Doyle*, held that where the prosecutor learned from one response that the agent would testify that defendant refused to answer a specific question, it resulted in prejudicial error for the prosecutor to go on eliciting similar answers. *United States v. Bridges*, 499 F.2d 179, 183 (7th Cir.), *cert. denied*, 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284 (1974). We had previously reversed where

an agent testified to two separate occasions where an accused responded that he did not have anything to say. *United States v. Kroslack*, 426 F.2d 1129, 1130–31 (7th Cir. 1970). Those cases are readily distinguishable.

We think that Testimony II and III are just too vague to constitute an impairment of defendant's Fifth Amendment rights.

5. Claim That Illegally Seized Evidence was Before Jury

On cross-examination of defendant, the government asked defendant whether certain photographs were accurate depictions. Defendant was not permitted to consult counsel at that moment, and responded that some were accurate and some had been suppressed because of an illegal search. The latter were not offered nor received in evidence. The most that can be said is that the jury heard something about an illegal search. We find no reversible error.

6. Claim of Inference From Improper Question

 On cross-examination of defendant, the prosecutor asked a question which might have permitted defendant to include in his answer the fact that the jury had disagreed on these counts in the first trial. Apparently, so realizing, the prosecutor withdrew the question before it was answered. We find no reversible error.

7. Claim That Question Confused the Jury

 On cross-examination of defendant, the government had asked if he owned the Impala, and defendant answered he did not. On redirect, defense counsel had referred to the government's question and asked what the person who sold the Impala had to say about that. The government had objected that this called for hearsay. The defense said it was a statement in court in defendant's presence, and the judge overruled the objection. Referring to the testimony of Don Wiltheiss at the earlier trial, defendant answered "he came and he said I wasn't the one that bought it." What the

defendant now challenges as confusing, and hearsay, is that on re-cross of defendant, the government brought out that at the same time Wiltheiss had looked at the identification set of seven photographs and said that he had identified defendant's as "the person that most clearly resembled the individual he sold the vehicle to." We find no error.

### 8. Claims Concerning Secret Room Evidence

 Defendant testified that on the night of September 1, he was asleep in his room, did not leave it except to go to the bathroom, and that Sandra Barton slept outside the door of his room. She testified he did not leave, and his mother testified similarly. On cross-examination of defendant, the government brought out that there was a concealed room next to defendant's room with access from it. This at least suggested the possibility that defendant could have left his bedroom without the knowledge of Sandra.

The argument now is that this cross-examination exceeded the scope of the direct. We do not agree, defendant having testified to his alibi.

On rebuttal the government called a witness who had examined the room during 1979, and testified it was very easy to remove a piece of plasterboard at the ceiling of the room and the floor of the attic. Defendant also argues that the witness was called only for the purpose of impeaching defendant, who had testified there was no access. This rebuttal evidence was not limited, however, to impeachment, since it also tended to rebut the alibi.

### 9. Claim of Invasion of Attorney-Client Privilege

 As already noted, defendant told Agent Lucas he had no interest in the Impala. Although defendant later described his possession of the Impala, the government did not know defendant would testify. It was important to prove that defendant did have responsibility for the car.

In its case in chief, the government called Attorney Keithley. Over objection, Keithley testified that he met with defendant on September 20, 1978; that thereafter he called an automobile dealer, told him the description and location of the Impala and "that my client had lost his keys; they'd have to have some keys made, and the motor wasn't working, there was something wrong with it, it would have to have some repair work, and would they tow it in, repair it and bill it to my client Brett Kimberlin." By the time a towing vehicle reached the Impala, the FBI had decided to get a search warrant and would not permit removal.

The attorney was transmitting a message at the direction of the client. The communication of the message from defendant to the attorney for the purpose of further transmission was not confidential and not privileged. *See McFee v. United States*, 206 F.2d 872, 876 (9th Cir.1953).

### 10. Claim of Improper Use of Mug Shots

 At the time of defendant's arrest photographs were taken of him. He was wearing the uniform. The pictures were clearly so-called mug shots. They were admitted in evidence. They were relevant because of the uniform. The fact of his arrest was then before the jury, and his convictions on the related counts came in later during his testimony. We find no reversible error.

### 11. Claim of Improper Closing Argument

Defendant asserts that the government's closing argument "was a mass of impropriety." One of his citations was characterizing MMAN as the "patented" ingredient of Tovex 200. Upon objection, government counsel withdrew the word "patented." We have addressed all other claims. We are satisfied that in the light of the evidence in the record the argument was within the bounds of fairness and that it is not necessary to discuss the details of each reference in this opinion.

### 12. Claims of "Other Misconduct"

Defendant cites as misconduct three instances of government questions which, with their answers, he claims raised inferences which were unfair. He also asserts that an answer by an ATF agent, contradicted by another witness, was a "lie." We have considered each claim and find nothing to be deemed reversible error.

### K. CLAIM OF INSUFFICIENT PROOF

#### 1. Proof of Unlawful Making of Firearms

Count 9 charged that on or about September 1, 1979, defendant "manufactured"[7] a firearm (destructive device) in violation of 26 U.S.C. § 5861(f) (and the penalty provision, § 5871). Counts 10 through 16 made the same charge on the date of the other explosions.

Section 5861(f) provides that it is unlawful to make a firearm in violation of the provisions of the chapter. Section 5821 requires a tax to be paid (by a stamp) upon the making of a firearm. Section 5822 prohibits any person from making a firearm unless he has done all of the following: filed an application, paid the prescribed tax, and "obtained the approval of the Secretary to make and register the firearm and the application form shows such approval." Section 5841(c) provides that each maker shall, prior to making, obtain authorization and such authorization shall effect the registration.

 As evidence of violation, the government introduced a self-authenticating document (FED.R.EVID. 902), an ATF certification that a diligent search of the National Firearms Register and Transfer Record (NFRTR) failed to disclose evidence that any firearm had been registered or acquired by defendant, or that he had made application to make firearms, or paid the making tax. It has been held that such certification is admissible proof of lack of registration under Rule 803(10), FED.R. EVID., not admissible proof of failure to file an application or pay the tax, because filing occurs in advance of registration and payment of the tax is not directly reflected in NFRTR. *United States v. Stout,* 667 F.2d 1347, 1352 (11th Cir.1982), and *United States v. Beason,* 690 F.2d 439, 443 (5th Cir.1982), *cert. denied,* 459 U.S. 1177, 103 S.Ct. 828, 74 L.Ed.2d 1023 (1983).

Because a person must obtain the Secretary's approval before making a firearm, and because such approval effects registration, we think the ATF certification that no registration was of record is sufficient evidence of this element of the offense.

We note that the *Stout* and *Beason* courts reversed the convictions of the unlawful making counts in those cases. Whether the indictments were different in form from the one before us, or not, those opinions appeared to treat the nonpayment of the tax as the critical element of the charge, not adequately proved. *Stout,* 667 F.2d at 1352–53; *Beason,* 690 F.2d at 441 n. 1, 446.

Additionally, in the case before us, defendant made no objection at trial to the portions of the certification with respect to failure to find evidence of the filing of an application, or payment of tax.

We note also that in this case the court instructed that the jury must find, in order to convict, that defendant failed to file an application or failed to pay the making tax. The court did not refer to the third step which must also be fulfilled, that defendant must have obtained approval before making, but no objection was made to the instruction.

#### 2. Proof of Federal Financial Assistance to School Town of Speedway

 18 U.S.C. § 844(f) makes it an offense maliciously to damage or destroy by means of an explosive any property owned, possessed, or used by any institution receiving federal financial assistance. Counts 18 and 22 charged such offenses against property of the School Town of

---

**7.** The indictment said he "manufactured." As the terms are used in this chapter, and in § 5861(f), "made" rather than "manufactured" was clearly meant. A "manufacturer" must register annually, under § 5802.

Speedway on September 2 and 6. Its property was damaged by explosions on those dates.

Defendant contends there was no proof that the School Town received federal financial assistance within the meaning of § 844(f).

It has been held that federal funds need not be directly disbursed to an institution in order to constitute federal financial assistance under § 844(f). *United States v. Apodaca*, 522 F.2d 568, 571–72 (10th Cir. 1975); *United States v. Brown*, 384 F.Supp. 1151 (E.D.Mich.1974), decision on motion affirmed although conviction reversed on other grounds, 557 F.2d 541, 559 (6th Cir.1977). In interpreting a different statute, the Supreme Court decided that a college whose students financed their education with federal grants is a recipient of federal financial assistance. *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984).

A very thoughtful opinion by Judge Cornelia Kennedy in *Brown, supra,* analyzes the constitutional authority by which Congress could enact § 844(f). She found it in the Necessary and Proper Clause, Article I, Section 8, Clause 18, and concluded that "Congress must have the means to protect those institutions it is currently funding to carry out federal programs...." 384 F.Supp. 1160. The "institution" need not be a part of government, but if it effectuates a national program with federal funds, it acts as an instrumentality of the federal government. 384 F.Supp. at 1159.

In *United States v. Sweet*, 548 F.2d 198, *cert. denied*, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977), this court considered the intended reach of § 844(i), making it an offense maliciously to damage property used "in any activity affecting interstate or foreign commerce." Upholding the application of the statute to use of explosives in an intrastate activity having a *de minimis* effect on interstate commerce, we noted legislative history indicating that Congress intended to exercise "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause." *Id.* at 200 (citation omitted).

Although the legislative history of § 844(f) spells out as its constitutional base only the power of the government to protect its own property, it clearly expresses outrage over bombings of university and other non-federal property, and urgency over supplying expanded federal investigative and prosecutive authority to meet the problem. "This section also protects real and personal property belonging to institutions and organizations receiving Federal financial assistance such as universities, hospitals, and police stations." *See* House Report No. 91–1549, Organized Crime Control Act of 1970, 1970 U.S.CODE CONG & AD.NEWS, pp. 4007, 4011, 4014. We have no doubt that Congress intended broad construction of the terms used, within constitutional limits.

The proof here was that the School Town of Speedway was one of ten school corporations entering into a Joint Agreement for Special Education Services, in the summer of 1970. One of them was to be the Servicing Corporation. It would provide joint programs for students with various types of exceptional problems. The joint program would be administered by the Servicing Corporation. The Agreement provided for a Board of Directors, composed of all the superintendents. One of the functions of the Board would be the development of the assessment formula for each Participating Corporation.

The Agreement recited that the parties intended that financing of the joint special education project can be obtained by each Participating Corporation through federal and state funding programs, but provided that each Participating Corporation shall be responsible to pay only its share computed on a formula based on enrollment from each. There was provision for withdrawal, amendment, and renewal from year to year. There was a recitation of authority for the Agreement, including a state statute authorizing two or more local school corporations to engage in joint purchasing and employment programs.

The director of West Central Joint Services Cooperative, a school for handicapped children, testified that this Cooperative, or school, was established by the Agreement. Money used for operation is forty percent federal and the balance state. The Participating Corporations send students with special needs to the Cooperative for training. Speedway has sent up to six children. In 1978 it sent four. He said that in each year the federal money was about $300,000 out of a total of $750,000, and he calculated that when Speedway sent five students, about $10,000 of the federal money would be helping to train the Speedway students.

Defendant appears to contend that the Co-op should be deemed an entity apart from Speedway and the other Participating Corporations; Speedway received a valuable benefit when some of its students were trained by the Co-op, but Speedway did not receive money and therefore received no financial assistance. It would follow under the *Brown* analysis that Speedway would not be rendered an instrumentality of the federal government so that Congress could protect its property.

In our view, however, the "Co-op" seems not to be a separate entity, but a group of corporations acting jointly by agreement to carry on these specialized services. It seems reasonable and in keeping with Congressional intent to view each school corporation as performing the public and federally encouraged function of educating its students in need of special services, accomplishing that by collective action for the sake of efficiency, and receiving its proportionate share of federal money with which to do so. So viewed, Speedway was receiving federal financial assistance within the meaning of § 844(f).

### 3. Claim of Insufficiency of Evidence As A Whole

We have already indicated our view that the evidence was "strong, albeit circumstantial, support for the guilty verdict." *Supra*, p. 221. Defendant's testimony and that of his witnesses supporting his alibi testimony did not, as claimed, produce a reasonable doubt as a matter of law.

### L. CLAIM OF JUROR MISCONDUCT

#### 1.

 On October 23, 1981, defendant filed a timely motion for new trial pursuant to Rule 33, FED.R.CRIM.P. The motion stated a belief that juror misconduct had occurred. No affidavits or record citations were supplied. The motion requested a hearing, and stated that defendant "is prepared to adduce evidence" of three instances of alleged misconduct. The motion was denied December 10, *United States v. Kimberlin*, 527 F.Supp. 1010 (S.D.Ind. 1981).

Summarizing, defendant claimed:

a. One juror, during trial and in presence of all others, said, "They ought to hang him now, so that we can go home," or words to that effect.

b. One juror made notes, and when reminded by other jurors that note-taking had been forbidden by the judge, tore them up.

c. One juror commented in the presence of the others during trial that he or she had been hypnotized before and discussed the experience. Defendant stated belief that on *voir dire* this juror had denied being hypnotized.

Judge Steckler's rejection of allegation b has not been challenged on appeal.

In 527 F.Supp. at 1013, the court said:

In summary, the Court concludes that the allegations made by defendant in his motion do not require a hearing because the only types of inquiry which would aid the Court in assessing possible effects of such alleged conduct are not permitted by the Rules of Evidence [citations omitted]. Further, the Court finds that none of the three allegations, if true, would create prejudice to the defendant, such that a new trial would be warranted.

We recognize that these communications between jurors were allegedly made during the course of trial. Hence, they are not literally included in the prohibition of Rule 606(b) against testimony by a juror as to a statement during the course of the jury's

deliberations. We note, also, as did Judge Steckler, that a juror's relating of a past personal experience may literally be "extraneous ... information." We agree, however, with Judge Steckler that the Rule would not permit a juror to testify to the effect of the communication upon his mind or emotions, or concerning his mental processes in connection with the verdict. Thus, a hearing would be fruitless unless these statements, if made, would be presumed to be prejudicial.

We find no error of law or abuse of discretion in Judge Steckler's unwillingness to assume prejudice or to conduct a hearing to determine whether the statements were made.

### 2.

Defendant was sentenced December 30, 1981. Notice of appeal was filed January 7, 1982. Thus the proceedings before us on Appeal No. 82–1025 are those of record up to that date.

Counsel have argued four other claims of juror misconduct which were not presented to the district court in the motion for new trial of October 22, 1981. From the briefs and from the record of proceedings which took place after January 7 we gather the manner in which these claims subsequently came before the district court.

Defense trial counsel having filed notice of withdrawal January 7 and 8, subsequently granted January 26, defendant filed, *pro se*, on January 19 a motion to reconsider denial of the motion for new trial. Attached was an affidavit of alternate juror Irey, affirming statements in a letter to a judge of this court listing nine numbered claims of jury misconduct.

Paragraphs numbered 4, 5, and 8 corresponded to a, b, and c, included in the October motion denied by Judge Steckler, although somewhat differently stated. We are told that Ms. Irey was the source of the claims made in the October motion.

Paragraphs numbered 1, 3, 7, and 9 were not presented to Judge Steckler in the October motions and the facts are not reflected in the trial record. They correspond to claims argued or referred to in the defendant's brief on appeal, but they are not properly before us.

Judge Steckler denied the defendant's motion for reconsideration February 3, 1982, and no appeal was taken.

### 3.

■ Defendant has also argued on appeal that one of the jurors "repeatedly slept." This claim corresponded to Ms. Irey's paragraph 2. It was not raised in the October motion before Judge Steckler. In fact, the claim happens to have been reflected in the record, and to that extent we can consider whether there was plain error.

During the second day of trial, Judge Steckler called counsel to a side bar conference and noted that a juror appeared to be nodding. Counsel said they had seen the juror sleeping. Defense counsel said he thought something should be done, but left how to do it up to the judge. Judge Steckler then addressed the jury, pointing out the need to be alert and pay careful attention. Six weeks later, one of defense counsel asked for a side bar conference. He said the same juror appears to be asleep again. It was the second time this week he had noticed, "and I don't know how the Court should handle it." The prosecutor agreed the juror was asleep. Defense counsel said:

> Your Honor, we would request at this time a recess to get her up on her feet.
>
> THE COURT: Is that all?
>
> MR. MCSHANE: Yes.

The court called a recess.

The court might have considered whether the juror was unable to perform her duties. Upon such a finding, Rule 24(c), FED.R. CRIM.P., would authorize replacement with an alternate. *United States v. Barrett*, 703 F.2d 1076, 1083 (9th Cir.1983). Neither side requested that or any less drastic action, except the recess, and the two excerpts from the record just referred to, do not demonstrate plain error.

### 4.

■ A point argued under the heading of Juror Misconduct is really a challenge to Judge Steckler's conferring with a juror about a reported personal problem of the juror. The conference occurred after discussion with counsel. Neither counsel nor the defendant was present, but the conference was recorded. The point is raised for the first time on appeal.

The conference occurred September 24, about four weeks after the beginning of the hearing of testimony. The problem was that the juror's husband had a new job in Florida, starting October 5. His employer had arranged for travel together the coming week (September 29), but would not pay for the juror's travel if she came later. She thought she could stay with her parents after he left. They discussed the financial problems which would arise if the juror were unable to travel with her husband. The length of time for completion of the trial was discussed, including "ten days or two weeks," "two weeks," "two weeks after next week," and "two or three days longer than that." The juror indicated that other than having to pay an individual fare to Florida, she would not have any problem. The verdict was returned October 15, three weeks later.

There is no claim that any of the content of the conference tended to have a prejudicial effect. Appellate counsel's surmise that the juror was embittered and held the defendant responsible for the delay has no support in the record, and if such feelings did arise, it would not be reasonable to find them caused by the conference with the judge.

At the colloquy before the conference defense counsel said he opposed replacing the juror with an alternate at that stage and urged the court to discuss the matter with the juror.

MR. STANTON [Defense Counsel]: ... for your Honor to do it in camera, either by yourself or with both parties present but not saying anything.

THE COURT: Without the parties present?

MR. STANTON: Either without or with the parties present, it makes no matter to us. Just to advise her that it is likely that she be required to stay on the jury and that she should make plans accordingly. And I think at that time then, if later she comes back and says "Oh, I just can't do this," or something, then I think it can be rethought.

But we would urge the Court to say something, that she is probably going to be required to be on the jury beyond the date that her husband moves down there.

After hearing from government counsel, the court announced he would call the juror in and talk to her.

At that point defense counsel interposed: MR. STANTON: I don't know why we couldn't be present but not ask her anything.

THE COURT: Well ...

MR. STANTON: We would prefer to be present but not ask her anything.

THE COURT: Well, I will talk to her in camera alone, and if the results of that indicate that counsel should be given an opportunity to question her, we'll set it for another session in chambers.

After Judge Steckler conferred with the juror, he reported the matter to counsel, and defense counsel said:

MR. STANTON: Excellent. Thank you for talking to her, Judge.

Rule 43, FED.R.CRIM.P., requiring that a defendant shall be present at every stage of the trial contains no exception for conferences between judge and an individual juror in this type of situation.

In *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), the Supreme Court addressed a *habeas corpus* proceeding involving a state conviction. There had been unrecorded and undisclosed conferences between the judge and a juror over some concerns the juror had about facts which had come to the juror's attention.

Petitioners had conceded that the undisclosed *ex parte* communications established federal constitutional error. The Court as-

sumed, without deciding, that defendant's constitutional rights to presence and counsel were implicated. *Id.* at 117 n. 2, 104 S.Ct. at 455 n. 2. The Court disposed of the case, summarily, on the basis of error which was harmless beyond a reasonable doubt.

The Court said:

There is scarcely a lengthy trial in which one or more jurors does not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.

*Id.* at 118–19, 104 S.Ct. at 456 (footnote omitted).

We would prefer to hold that presence of the defendant is not required at a conference like the one in this case, recorded, and held after discussion with counsel. Assuming, however, that it was error, even constitutional error, we deem it harmless beyond a reasonable doubt.

On Appeal No. 82–1025, we AFFIRM the judgment appealed from.

M. PART XIII OF DEFENDANT'S BRIEF

This portion is devoted to orders denying motions for new trial, filed in each of the three cases. These motions have been referred to by the parties as grounded on newly discovered evidence, and so viewed, they were all timely under Rule 33, FED.R. CRIM.P. In some instances, the claims made asserted government misconduct and the claims could have been framed as a motion under 28 U.S.C. § 2255.

Appeal No. 83–2190 brings us the order of June 15, 1983, denying the motion for new trial on Counts 1 through 22, filed September 28, 1982.

Appeal No. 83–2191 brings us the order of June 15, 1983 denying the motion on Counts 23 and 24, filed March 2, 1983.

Appeal No. 83–2341 brings us the order of July 6, 1983, denying the motion on Counts 26 through 34. That motion was *pro se*, filed November 1, 1982. As later indicated the motion must have been addressed to retrial of Counts 1 through 22, as well as 26 through 34.

The motions set forth some 19 claims, some of which are duplicative. On appeal, 15 claims are argued, but in several instances the argument is based in whole or in part on matters not reflected in the record properly before us. We shall exclude those matters. Unfortunately the briefs do not deal separately with the three motions. We shall discuss the claims in the order they were made in the motions.

## II. APPEAL NO. 83–2190 (COUNTS 1–22)

### A. [ARGUED AS POINT G.]

Defendant claimed that government agents falsely stated at the suppression hearings that there were no Federal or Justice Department "guidelines" regarding hypnosis at the time that the witnesses in this case were hypnotized. The government responded that it had represented only that the ATF did not at the time of the investigation have guidelines pertaining to the use of hypnosis. Defendant has not cited anything in the record to show that any representation was made as to the FBI or the Department of Justice guidelines.

Defendant has demonstrated, as a result of his use of the Freedom of Information Act (FOIA) that the FBI sent out an instruction on December 11, 1968 and on the same date the Assistant Attorney General in charge of the Criminal Division sent a memorandum to all United States Attorneys. Both required that before using hypnosis on any witness, written authorization must be obtained. Recommendations as to procedure were contained in an FBI memorandum, dated January 27, 1976.

He also produced copies of correspondence within ATF as early as 1976 concerning the formulation of guidelines. None appears to have reached final form until

December 14, 1979, when a chapter, apparently of a manual on Investigative Procedures, was issued for official use only. It was entitled "Hypnosis as an Investigative Technique."

Defendant also produced a copy of a message to all ATF Special Agents-in-Charge. It was dated September 15, 1978, after the hypnotic sessions of the four Graham store clerks, but before those of Carr and Jones. The teletype read:

It has come to our attention that hypnosis has been used as an investigative aid. It is imperative that all future requests for the use of this technique be approved by this office.... Bureau Headquarters approval may be given after consultation and review to insure that the Department of Justice Guidelines and policies are adhered to....

We would prefer that the representatives of the government had been more forthcoming, stating to defense counsel what the general situation was. Yet the record scarcely convicts them of perjury or false representation as to the existence of ATF guidelines at the time. Indeed, one of the persons who performed the hypnosis testified: "I understand the guidelines to be that at a point they [ATF] must receive permission and document of the person doing the hypnosis with one of their superiors in Washington, DC."

In any event, the September 15 instruction could have had no bearing on the hypnosis of four persons September 11. If the agents proceeded with the other two without the required approval, their violation of an internal policy directive or housekeeping rule did not render the hypnotized witnesses incompetent. *See Sullivan v. United States*, 348 U.S. 170, 173, 75 S.Ct. 182, 184–85, 99 L.Ed. 210 (1954); *Delay v. United States*, 602 F.2d 173, 178 (8th Cir. 1979), *cert. denied*, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980); *United States v. Thompson*, 579 F.2d 1184, 1187 (10th Cir.), *cert. denied*, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978); *United States v. Nelligan*, 573 F.2d 251, 255 (5th Cir. 1978). Even where evidence is obtained in

violation of an agency regulation, there is no exclusionary rule as a matter of course. *United States v. Caceres*, 440 U.S. 741, 755, 99 S.Ct. 1465, 1473, 59 L.Ed.2d 733 (1979).

**B. [ARGUED AS POINT C.]**

Defendant refers to a representation to the district court that no electronic surveillance had been done. Through FOIA he obtained copies of documents which are illegible in large part, but which make references to electronic devices. The government answered that no electronic surveillance had been utilized against defendant and appears to concede there were instances of authorization.

In denying the motion, Judge Steckler read one document as indicating two uses of an authorization to intercept conversations of persons other than defendant, and found none disclosing actual use to surveil the defendant.

The briefs add nothing new, and we find no basis for reversal.

**C. [ARGUED AS POINT O.]**

Through FOIA, defendant obtained documents showing that a truck he had in Texas in February 1979 was checked for traces of Tovex and the finding was negative. Defendant was not informed. Judge Steckler found "[d]efendant has not hinted at how such information would lead to a probable acquittal on retrial of the bombing counts." We deem the non-disclosure harmless under the standard of *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976).

**D. [ARGUED AS POINT E.]**

Defendant sought disclosure of confidential informants. The government reported three. Defendant claims that George Balboa was a fourth. Judge Steckler found the allegation unsupported, and no demonstration was made of how it could lead to acquittal. We agree.

A copy of a document obtained through FOIA and indicating that an unnamed confidential informant would attempt to discover whether defendant planned to use an

alibi defense was admittedly obtained after the denial of the motion for new trial. This claim is argued as point A., but is not properly before us. An additional claim concerning informant Ronald Coy, argued as part of point E., was not presented to the district court, and is not before us.

### E. [ARGUED AS POINT L.]

Defendant learned after trial that government witness Shari Barton may have been hypnotized. He argues that this should have been disclosed to him.

Sandra Barton testified at trial that she was with defendant throughout the evening of September 1. She met him at his home at 6:00 or 6:30; they went out to dinner; they returned to defendant's house. She was with him until he retired and she did not observe him leave during the night.

Since the explosions during that night occurred from 9:49 PM to 1:50 AM, and the timers could be set for as much as 60 minutes, the overall critical period would have been from the hour preceding 9:49 PM to the hour preceding 1:50 AM. Thus her testimony was significant to the defense.

Shari Barton is Sandra's daughter and Patricia Strait's niece. On rebuttal she identified a letter she had written to Mrs. Strait. The letter was dated September 1, 1978, and Shari testified she had written the letter on that date. Without objection she read a paragraph saying, in summary, that "tonight at work" her mother had come about 7:30 PM and offered to wait until 8:00 PM and take Shari home. Shari testified that this occurred September 1, although she did not remember anything more than was in the letter. Shari testified that her mother did wait and take her home, but did not come in with her when they got home. It seems fair to note that the letter suggests some estrangement between Shari and her mother.

In December 1981, defendant took Mrs. Strait's deposition in civil litigation. She testified to a telephone conversation she had with ATF Agent Niehaus the day before she came to Indianapolis for the trial.

Niehaus told Mrs. Strait of a report that some individual had Shari under hypnosis at a party. The individual asked Shari something about September 1 "and she said she had been with her mother in Brown County having dinner with her mother on that day." Niehaus said if that were true, they were going to call Shari to testify at the trial. Mrs. Strait said she was almost sure that Shari was in Speedway at the time of the bombings from a letter or something she had written.

She recalled that Shari had written her almost daily during that period. After the conversation with Niehaus, she found the letter and brought it to Indianapolis.

On July 9, 1982, defendant's attorney obtained an affidavit from Shari recounting that she was at a friend's home in 1978 or 1979. A man who was there with his wife said he was an amateur hypnotist, and he tried to hypnotize the others, without success. When he attempted to hypnotize Shari, she "played along" and acted out his requests. She also said, "[t]hat when Ben Niehaus asked this affiant about this incident his information about it did not agree with this affiant's recollection."

Judge Steckler concluded there was no duty on the part of the government to disclose the report that Shari had been under hypnosis not performed by or for the benefit of a law enforcement agency. He also observed that defendant had not shown that the information would have altered the verdict.

█ We find no reason to reverse. We think Judge Steckler was correct in deciding that the government was under no duty to disclose the fact of hypnosis for which it was not responsible (and which did not produce the testimony given at trial). Failure to disclose the fact of hypnosis was the only claim made in district court. It is the argument made in the brief on appeal, except that there is, in addition, a slight hint at the argument that the government had an obligation to disclose an inconsistent statement, of which it had knowledge, whether under hypnosis or not. Although

the reported prior statement, if made, would have impeached her testimony and her statement in her letter that she and her mother were together on September 1 for half an hour in Indianapolis, the statement would have put her and her mother together at dinner in Brown County on September 1.

Under the circumstances we consider the non-disclosure was not material, applying the test of *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976).

#### F. [ARGUED AS POINT J.]

█ Ron Confer testified at the third trial that on an occasion in July, August, or September, 1975, he had seen defendant with boxes which defendant said contained explosives. Defendant asserts that the government did not provide the defense with any statement of Confer except it did provide Confer's grand jury testimony in which Confer said he had never seen defendant with explosives.[8] Defendant produced a portion of Confer's deposition taken by defendant in a civil action, December 3, 1981, after the trial.

Q: How did [ATF Agent Donovan] take your statement?

A: Just talk back and forth, and then—

Q: Did you sign anything?

A: I think he wrote some notes and—as he—and then, I think I signed something—you know, signed a statement. You know, I think we talked for a while, and then he wrote it down and said, "Is this the way you recall it?" And I said, yes, and signed it.

The significance from defendant's point of view was that if Confer had said the occasion was in late August, defendant could have shown that he was in Hawaii

8. Confer explained the difference in testimony. He said that about the time of the first trial someone claiming to represent defendant called and asked him whether he still had possession of any Army surplus boxes he and defendant had purchased. He went on:

And when the people called me back, I described the boxes that I still had in my possession, the Army surplus wooden boxes, and I also mentioned to them that it just flashed

with the permission of his parole officer the last three weeks of August, 1975.

Although a signed, written statement, if made, would have been subject to 18 U.S.C. § 3500, defendant made no motion for production after Confer testified. The government asserted in district court that it disclosed all *Jencks Act* material, and so represents again on appeal.

Judge Steckler ruled:

Assuming that there was a statement as defined in the Jencks Act, 18 U.S.C. § 3500(e), failure to turn it over to the defense would not warrant a new trial in this case. The alleged discrepancies between Confer's testimony and the statement concerning the approximate date in 1975 of the occasion he saw the defendant with two boxes of explosives do not present an incongruity sufficient to raise a question of perjury. He stated on various occasions that the incident occurred in "late summer," "late August," "September," "between July and September." Since defendant repeatedly attacked Confer's credibility during cross-examination at trial, use of the purported statement for further impeachment purposes would have been merely cumulative. Furthermore, the Court cannot conclude the statement would have created a reasonable doubt that did not otherwise exist. Accordingly, no new trial is warranted as a result of the discovery of the statement. *U.S. v. Robinson*, 585 F.2d 274, 281 (7th Cir.1978), cert. denied, 441 U.S. 947 [99 S.Ct. 2171, 60 L.Ed.2d 1051].

We find no abuse of discretion nor reversible error.

#### G. [ARGUED AS POINT M.]

Defendant seems to make two claims concerning the testimony of Coleman that

through my mind that I did help him unload a couple of cardboard boxes that he claimed had explosives in them and since I recalled that, I felt it was information they should have, and also information that I would have to relate to the ATF agents and advise them of that.

And they said, "Thank you. We'll not talk to you anymore."

he had seen defendant place a paper sack in the trash can at the site of explosion No. 1, after 9:00 PM September 1. Based on depositions which defendant took of Coleman and his wife in December 1981, defendant claims that Coleman had given statements which were not given to the defense, and, generally, that the government knew Coleman was not credible.

The government asserts that no written statements were taken from Coleman.

The portions of the depositions attached to the motion for new trial do not support the assertions in defendant's motion and accompanying memorandum.

H. [Argued As Points F. And I.]

In substance defendant claims that the government concealed that an Assistant United States Attorney was present at the first search of the Impala, as defendant later learned through FOIA. He also asserts that "an ex-FBI Agent, Charles Egger, contacted defendant after his trial and informed him that he had talked to one of the federal agents present at the first search of the white Chevrolet [Impala] and was told that evidence was 'planted' in that car by Government agents."

Under FOIA defendant obtained from ATF an interoffice teletype received September 25, 1978, reporting on the first (FBI) search of the Impala on September 21. In part, it said that an Assistant United States Attorney (name obliterated) "who was present when search conducted desired materials used to manufacture bombs be left in subjects car while he obtained a second search warrant for those items. AUSA (name obliterated) instructions were complied with. ATF will search car and obtain bombing materials."

Judge Steckler ruled: "Defendant has presented nothing to backup his assertion that evidence was 'planted' in the Chevrolet [Impala]. Furthermore, defendant makes no showing requiring a new trial based upon the presence of an Assistant United States Attorney at the search of an automobile."

We have carefully reviewed the testimony from the suppression hearing cited in defendant's brief on appeal. ATF Agent Donovan testified he was not present and did not recall everyone that was present, although he named an FBI agent and an ATF agent he believed were present. ATF Agent Niehaus testified he was present and named an FBI agent who was there although he believed there were five or six. He was asked:

Q: If you can't remember the names, do you know what other law enforcement agents were represented?

A: Just the FBI and ATF, of course. I was the only one there from ATF.

Given the failure to recall all the names, and what is at least an ambiguity whether someone from an investigative agency would think of the United States Attorney's office, or an Assistant United States Attorney, as a "law enforcement agent" the answer was not perjury.

The other citation in the brief is a colloquy between court and counsel during trial. Defense trial counsel was seeking to learn the names of individuals who participated in a different search, one of defendant's Jackson County real property. The judge was under the impression that the search of the vehicle was at issue and stated he would expect the government "to inform the defense of all of the persons who participated in the search and seizure...." Government counsel, in directing the court's attention back to the search of the real property prefaced by saying "Your Honor, if I may, I believe the Government has done that with the vehicle."

Although the court had said "all of the persons who participated" rather than "all of the law enforcement agents" present, we do not find, in context, any intentional concealment of the presence of the Assistant United States Attorney, as reported.

In argument, on appeal, defendant suggests there was a conflict of interest which should have been disclosed if the Assistant United States Attorney who observed the search was one of the two who represented the government at trial. He could have

been called to testify as a witness, and defendant says he would have called him (perhaps only for the purpose of disqualifying him).

Under these circumstances it is unlikely that the Assistant's testimony would have been needed, and we do not think his presence created an obligation by the government to disclose that he was there.

■ As to the claim that the evidence was planted, we can take judicial notice of the fact that there was an FBI agent named Charles Egger previously stationed at Indianapolis and dismissed June 26, 1978 for refusing to accept a transfer. See *Egger v. Phillips*, 710 F.2d 292 (7th Cir.), *cert. denied*, 464 U.S. 918, 102 S.Ct. 284, 78 L.Ed.2d 262 (1983). There is no affidavit from Egger describing the statement he allegedly said was made to him by an unnamed agent. Defendant produced a copy of part of an article appearing in the February 25, 1983 issue of the *Chicago Reader*. The story reports:

> Charles Egger, whose own quarrel with the FBI was the subject of a recent ABC TV *20/20* report (he claims he was fired for reporting the irregularities of a peer), said he was told by another agent that the timers had indeed been planted. Egger also said it was common knowledge among federal agents that Kimberlin was not the bomber.

Defendant explains the absence of an affidavit somewhat implausibly. He said he has been working with the Civil Rights Division of the Department of Justice concerning violations of his civil rights, including the "plant" allegedly reported by Egger. He did not attach the affidavit of Mr. Egger for the reason "[t]hat the United States Attorneys who are investigating the above allegation requested that I not disclose the full details of the investigation for fear that the investigation would be compromised."

Defendant's brief states additional facts allegedly supporting the claim of "planted" evidence, but these are not found in the record before us.

We conclude that there is no support shown for this serious charge sufficient to warrant a hearing, and agree with Judge Steckler's denial of the motion.

We have thus far discussed defendant's claims made in the motion filed by counsel September 28, 1982. Defendant also filed a *pro se* motion for a new trial November 1, 1982. Apparently it was directed at setting aside the guilty verdicts reached at both the first (Counts 26 through 34) and the third trials (Counts 1 through 22).

We have already discussed the points which were raised in both motions, *i.e.*, guidelines for hypnosis, alleged presence of an Assistant United States Attorney at the first search of the Impala, and alleged planting of evidence, the government's failure to provide full discovery and failure to disclose the use of electronic surveillance.

### I. [Argued As Point H.]

Two points in the *pro se* motion filed November 1, 1982, not contained in the motion filed September 28, 1982, did or could relate to the trial of Counts 1 through 22. These points do not appear to have been considered by Judge Steckler.

One point challenged the validity of the search warrants for the Impala because the affidavits included information from informants who had been hypnotized. Actually, this could only have referred to the statement in the affidavit for the second warrant that there had been interviews of employees of establishments selling timers, which disclosed that an individual fitting the description of defendant had purchased fourteen timers. In context, this information was of minimal significance and its omission could not reasonably have affected the magistrate's judgment in finding probable cause to search. *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978).

Moreover this point was not made in support of the motion to suppress heard before trial although defendant had knowledge at that time of the facts as to the hypnosis of the Graham clerks.

The argument on appeal is that the basis for the warrants came from hypnotized witnesses. That is clearly untrue as to the affidavit for the warrant for the first search of the Impala. That affidavit was made on personal knowledge except for information ascribed to named persons, and there is nothing to suggest that the affiant or the persons named had ever been hypnotized. If not foreclosed, the point could be better made about the affidavit for the warrant to search the Mercedes. A significant part of that affidavit related the observations by Andy Jones of materials in the Mercedes, but did not disclose that Jones had first given some of the information while under hypnosis.

Again, however, there was a pretrial motion to suppress the evidence obtained from the Mercedes, challenging the validity of the search warrant. This point was not raised although defendant was then fully aware of the hypnosis of Jones.

We think the point was waived.

If, however, there is reason for us to consider it, we deem it without merit.

The argument is derived from the holding in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). There the Court decided that a defendant, within prescribed limits, has a right to challenge the truthfulness of factual statements made in an affidavit supporting the warrants. The standard which must be met is that of "deliberate falsehood or of reckless disregard for the truth." *Id.* at 171, 98 S.Ct. 2684. Here the claim rests upon an omission. *Cf. United States v. Lefkowitz*, 618 F.2d 1313, 1317 n. 3 (9th Cir.1980), where the Ninth Circuit assumed, without deciding, "that the *Franks* rationale also permits an attack on search warrants obtained by affidavits marred by *omissions* of facts required to prevent technically true statements in the affidavit from being misleading."

 We conclude that the omission of the fact of hypnosis from the affidavits before us cannot amount to deliberate falsehood or reckless disregard for the truth.

### J. [ARGUED AS POINT D.]

The second point above referred to is a claim that defendant learned after trial that the government possessed photographs of defendant in his uniform, but not holding the FBI placard, and thus not appearing to be a mug shot. It is claimed, the mug shot picture of defendant in uniform was unnecessarily used, and must have been used in order to arouse prejudice. We deem the claim too insubstantial to warrant a hearing before the district court.

The claim argued on appeal as point N. was not presented to the district court.

We affirm the denial of a new trial on Counts 1 through 22.

### III. APPEAL NO. 83–2191 (COUNTS 23 AND 24)

Defendant claims three pieces of newly discovered evidence:

### A. [ARGUED ON APPEAL AS POINT J.]

The deposition testimony of Ronald Confer indicating he had given a signed statement to the ATF agents. We have already disposed of this claim as F. under Appeal No. 83–2190.

### B. [ARGUED ON APPEAL AS POINT K, 1.]

About the time of the second trial Joe Majko, a friend of Scott Kimberlin, informed defendant that he had helped Scott move explosives in the fall of 1978 and that Scott had said the explosives were for excavating purposes on the Jackson County property.

### C. [ARGUED ON APPEAL AS POINT K, 2.]

In the summer of 1982 a young lady told defendant's sister that she had been cleaning Scott Kimberlin's residence in late summer or early fall, 1975 and saw two boxes of explosives in the closet. He told her they were to be used for excavation on defendant's property.

 Judge Steckler concluded that defendant had not demonstrated that he was

unable to discover these three items of evidence in time for the May 1981 (second) trial. He further concluded that defendant failed to demonstrate that the evidence is material and not merely impeaching or cumulative, and that it would probably lead to acquittal on retrial. He pointed out that none of this evidence would affect the evidence that defendant came into possession of the explosives in May 1975 and used them.

We find no abuse of discretion or error of law and affirm the denial of a new trial on Counts 23 and 24.

## IV. APPEAL NO. 83–2341 (COUNTS 26–34)

The first trial, in 1980, which resulted in conviction on Counts 26 through 34, acquittal on Count 25, and mistrial on Counts 1 through 24, was before Judge Noland. When defendant, *pro se,* filed his motion for a new trial November 1, 1982, he also filed a motion to disqualify Judge Noland. Judge Noland denied the motion to disqualify and later denied the motion for a new trial.

Defendant argues on appeal that it was a denial of due process for Judge Noland to decide his motion for a new trial (argued as point q.). Defendant has not caused the motion to disqualify to be returned here as part of the record. We have not called for it because defendant has not based his argument on any showing made in the motion. Rather, he has asserted in his brief that "Judge Noland, who had presided over the first trial, immediately recused himself from any further participation in this case following sentencing."

Defendant has not brought before us any record of Judge Noland's announcement of recusal. This court, however, has already interpreted the record on this exact point, that "Judge Noland's disqualification was limited to Counts 1–24." *United States v. Kimberlin,* 675 F.2d 866, 868 (7th Cir. 1982); *United States v. Kimberlin,* 781 F.2d 1247, 1259 (7th Cir.1985). We have been shown no reason to read it otherwise.

We proceed to consider the claims raised in the *pro se* motion for new trial insofar as they relate to Counts 26 through 34.

A. [ARGUED AS POINT B.]

Defendant claims that the government failed to comply with the court's order granting discovery, apparently grounding the claim on the extensive materials obtained through FOIA.

Review of the FOIA documents failed to persuade Judge Noland that the government did not fully comply with the discovery requirements. We find no reversible error.

B. [ARGUED AS POINT D.]

Defendant claims that the agents had pictures of him in uniform which were not mug shots. They therefore did not need to use those taken at the time of his arrest, and those were used with prejudicial purpose.

Noting that defendant was present when the photographs were taken, and that in any event the only real issue would be the admissibility of the photograph, which was in fact admitted, Judge Noland found no merit in this claim.

We find no reversible error.

C. [ARGUED AS POINT P.]

Defendant, through FOIA, obtained a copy of a report on his arrest which described his uniform as "non-regulation in nature." He claims this was exculpatory evidence, intentionally withheld.

Judge Noland pointed out that the insignia worn by defendant on his uniform was of a design prescribed for use by employees of the Department of Defense. It was the possession of such insignia (not of a prescribed or regulation uniform) which was charged in Counts 26, 27, 28 and 29. Counts 31, 32, 33 and 34 alleged the wearing of "a uniform with a United States Department of Defense sleeve patch."

We are satisfied that the description of the uniform as "non-regulation in nature" was not exculpatory.

### D. [Argued As Point H.]

The only search of the Impala which yielded evidence relevant to Counts 26 through 34 was the first one. As already pointed out under Appeal No. 83–2090 there is no support for a claim that any information in the affidavit for that warrant came from a person who had been hypnotized.

### E. [Argued As Point C.]

Judge Noland adopted Judge Steckler's dispositions of the claims concerning electronic surveillance and the presence of an Assistant United States Attorney at the first search of the Impala. We have dealt with those claims under Appeal No. 83–2090 and have found no error.

The other claims in the *pro se* motion concerning hypnosis guidelines and planting of evidence relate only to Counts 1 through 22 and have been decided under Appeal No. 83–2090.

We affirm the denial of a new trial of Counts 26 through 34.

The judgment appealed from in No. 82–1025 is AFFIRMED. The orders appealed from in Nos. 83–2190, 83–2191, and 83–2341 are AFFIRMED.[9]

CUDAHY, Circuit Judge, concurring.

I write separately on the admissibility of the testimony of the hypnotized witnesses to emphasize why reliance on this evidence presents such difficult problems in this case and to suggest possibilities for avoiding some of these difficulties in the future. Although I think the question is exceedingly close and difficult, I agree with the majority that the admission of the testimony of the hypnotized witnesses does not require reversal. Nevertheless, the district court was presented with an unusually taxing problem, and I think we should take this occasion to propose standards that may be applied in determining whether to admit the testimony of witnesses who have been hypnotized before trial.

The majority correctly identifies the very serious dangers of using hypnotically in-duced testimony. The sources cited by the majority provide a thorough documentation of those hazards and I shall not attempt to explore them here in detail. Perhaps, the most pervasive (though not necessarily the most acute) danger of hypnosis is to make witnesses confident of their recall of matters they might otherwise feel themselves to be guessing at or even be sure they could *not* recall.

A persuasive case can be made for a rule of *per se* inadmissibility, and this is the route a number of states have taken. On the other hand, the Eighth Circuit has made the important point that a *per se* rule could be overly sweeping and might result in the exclusion of valuable and reliable evidence in some cases. *See Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112, 1122 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). As a matter of fact, all of the federal courts of appeals that have so far considered the issue have declined to adopt a rule of *per se* inadmissibility. *See Wicker v. McCotter*, 783 F.2d 487, 492 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *Clay v. Vose*, 771 F.2d 1 (1st Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986); *United States v. Adams*, 581 F.2d 193, 198 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). But at the very least, we should follow generally the path of the Eighth Circuit and adopt a rule that requires the district court, in cases in which hypnosis has been used, to conduct pretrial hearings on the procedures followed during the hypnotic session in question. The district court should assess the effect of hypnosis upon the reliability of the testimony before deciding on admissibility. *Sprynczynatyk*, 771 F.2d at 1122. The proponent of the evidence bears the burden of persuading the district court that the proposed testimony is sufficiently reliable and that its probative value outweighs its prejudicial effect. *Id.* at 1123. The district court must exercise great care to

---

9. Any other point not expressly discussed herein has been considered and found to be meritless.

ensure that any statements made after hypnosis that are admitted into evidence are the product of the subject's own recollections, rather than confabulation or recall tainted by suggestions received while under hypnosis.[1] *See United States v. Solomon,* 753 F.2d 1522, 1525 (9th Cir.1985); *United States v. Valdez,* 722 F.2d 1196, 1200–04 (5th Cir.1984); *United States v. Adams,* 581 F.2d 193, 198–99 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). Unless a showing to this effect can be made, the statements must be excluded.

In making its determination of admissibility, the district court should at least consider: 1) the appropriateness of using hypnosis for the kind of memory loss involved; *see Sprynczynatyk,* 771 F.2d at 1123; 2) the extent to which information concerning the events in question may be communicated intentionally or inadvertently to the subject; 3) whether there is any evidence to corroborate the hypnotically enhanced testimony, *see Sprynczynatyk,* 771 F.2d at 1123. Further, the district court should consider the extent to which the safeguards articulated in *State v. Hurd,* 86 N.J. 525, 545–47, 432 A.2d 86, 96–97 (1981) and *Sprynczynatyk,* 771 F.2d at 1122–23, were followed.[2]

One almost indispensable safeguard is to require that the hypnotist first elicit a free narrative report from the subject before questioning that subject more specifically. This procedure is important because information elicited in a free narrative is less likely to be confabulated.

It may not be crucial that testimony *always* be excluded if the *Hurd* and *Sprynczynatyk* safeguards were not employed. Neither does it necessarily follow that testimony should always be admitted if these safeguards were observed. I believe, however, that the safeguards provide some *minimal* guidelines upon which the district court, faced with evaluating these elusive problems, may rely. Of course, the district court need not limit itself to the consideration of the factors identified in the guidelines but should consider all circumstances that may affect the reliability of the testimony in light of current scientific knowledge about the effectiveness and hazards of hypnosis.

In the present case, although there was, of course, a full pretrial hearing, few, if any, of the requirements of the guidelines had been followed in connection with the hypnosis sessions. It is therefore almost impossible for us to evaluate—certainly on a cold record—the reliability of the testimony affected by hypnosis. It is almost equally difficult to know with any assurance what role this testimony played in the thinking of the jury. Nonetheless, the majority has made as searching an inquiry as seems possible under the circumstances and I concur in its ultimate conclusion.

There are other substantial problems in this trial including showing the jury mug shots of the defendant taken in connection

---

**1.** In this connection, the courts must, of course, exercise the highest degree of caution in criminal cases in order to protect the rights of the accused. *See State v. Hurd,* 86 N.J. 525, 547 n. 6, 432 A.2d 86, 97 n. 6 (1981).

**2.** These are recited in the majority opinion but restated here in a slightly more detailed form:

(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis and aware of its possible effects on memory so as to be able to aid in the prevention of improper suggestions and confabulation.

(2) The qualified professional conducting the hypnotic session should be independent of either party and should have little investment in the ultimate disposition of the case. The qualified professional should have minimal preconceptions about the case.

(3) Any information given to the hypnotist by either party should be noted in writing so that subsequently the extent of information that the subject received from the hypnotist may be determined.

(4) Before hypnosis, the hypnotist should obtain a detailed description of the facts from the subject, avoiding adding new elements to the subject's description.

(5) The session should be recorded, and preferably videotaped, so that a permanent record is available to ensure against suggestive procedures.

(6) Only the hypnotist and the subject should be present during any phase of the hypnotic session.

with another charge. The jury also learned in one way or another about Kimberlin's connection with a variety of other "bad acts" like possession of the uniform of a Defense Department security officer, participation in a drug conspiracy and possession of weapons. Many of these matters, taken individually, may not be in themselves of crucial significance. But the cumulative impression on the jury raises real questions of prejudice. Although these and a number of other problems are very troubling, I think the majority has addressed them conscientiously and in a fashion that sustains the result.